UNITED STATES of America, Appellee,

v.

Joseph INDELICATO, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Richard F. NUTILE, Defendant,
Appellant.

Nos. 79–1068, 79–1069.

United States Court of Appeals,
First Circuit.

Argued Sept. 6, 1979.

Decided Nov. 20, 1979.

Gerald Alch, Boston, Mass., by appointment of the Court, for defendant, appellant Joseph Robert Indelicato.

Leonard M. Frisoli, Jr., Cambridge, Mass., by appointment of the Court, for defendant, appellant Richard F. Nutile.

Stanley E. Greenidge, Sp. Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., and Jeremiah T. O'Sullivan, Sp. Atty., Dept. of Justice, Boston, Mass., were on brief, for appellee.

Before KUNZIG,* Judge, U.S. Court of Claims, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Defendants-appellants Richard Nutile and Joseph Indelicato were convicted by a jury on three counts of unlawfully and willfully possessing United States Treasury checks stolen from the mails, 18 U.S.C. § 1708,[1] three counts of uttering and publishing as true the same United States Treasury checks with an intent to defraud the United States, 18 U.S.C. § 495,[2] and of aiding and abetting on all counts, 18 U.S.C. § 2.[3] Defendants appeal their convictions, alleging the commission of various errors by the district court during the course of their joint trial. We affirm.

### The Indictment

The indictment handed down by the grand jury contained nine counts alleging unlawful activity by three persons: appellants Indelicato and Nutile and Anthony Costa. Costa pleaded guilty to Counts V and IX, which pertained only to him, received a sentence of two years probation and testified against appellants at their trial. Count I, a conspiracy count, was eliminated from the consideration of the jury when the district court dismissed it for failure of the government to present evidence to support its allegation that the checks were stolen from a receptacle owned and maintained by the Post Office.

### The Facts

At trial, a stipulation was put in evidence which stated that sixty-eight United States Treasury checks were mailed to the named payees at various times throughout the fall and winter of 1974 and the spring of 1975, and that, if called to testify, the payees would testify that they neither received nor endorsed the checks. During the course of the trial, the government put in evidence the sixty-eight checks, all of which had been negotiated and presented for payment

* Sitting by designation.

1. 18 U.S.C. § 1708 provides:

Whoever steals, takes, or abstracts, or by fraud or deception obtains, or attempts so to obtain, from or out of any mail, post office, or station thereof, letter box, mail receptacle, or any mail route or other authorized depository for mail matter, or from a letter or mail carrier, any letter, postal card, package, bag or mail, or abstracts or removes from any such letter, package, bag, or mail, any article or thing contained therein, or secretes, embezzles, or destroys any such letter, postal card, package, bag, or mail, or any article or thing contained therein; or

Whoever steals, takes, or abstracts, or by fraud or deception obtains any letter, postal card, package, bag, or mail, or any article or thing contained therein which has been left for collection upon or adjacent to a collection box or other authorized depository of mail matter; or

Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted—

Shall be fined not more than $2,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 495 provides:

Whoever falsely makes, alters, forges, or counterfeits any deed, power of attorney, order, certificate, receipt, contract, or other writing, for the purpose of obtaining or receiving, or of enabling any other person, either directly or indirectly, to obtain or receive from the United States or any officers or agents thereof, any sum of money; or

Whoever utters or publishes as true any such false, forged, altered, or counterfeited writing, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited; or

Whoever transmits to, or presents at any office or officer of the United States, any such writing in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited—

Shall be fined not more than $1,000 or imprisoned not more than ten years, or both.

3. 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

to the United States. The checks had been negotiated by one or more of three small grocery stores in Massachusetts: the Green Apple, located on Gainsborough Street in Boston; the Mini Mart, located on Beacon Street in Boston; and a store owned by Costa located in Randolph, Massachusetts.

The government introduced the following evidence to connect appellants with the checks. Several vendors and jobbers of groceries in the Boston area testified that they serviced the Green Apple and, on the basis of that experience, believed that the store was owned and/or operated by Nutile. They testified further that on numerous occasions they were paid for goods delivered to the Green Apple with Treasury checks which later bounced, and identified these checks as being among those alleged in the indictment to have been stolen from the mails. Henry Boch, one of the jobbers, testified that Nutile endorsed a Treasury check payable to Anne E. Flanagan with the words "Green Apple" and paid him for goods with it. Agent Artone of the United States Secret Service testified that fingerprints on two of the Treasury checks enumerated in the indictment and negotiated by the Mini Mart were identical to Nutile's fingerprints. Other vendors testified that they believed Nutile operated the Green Apple in partnership with another person.

Suppliers and creditors of the Mini Mart testified that Indelicato owned and operated the store, and that Indelicato paid them for goods and services purchased by the Mini Mart with Treasury checks enumerated in the indictment. One supplier testified that he received Treasury checks enumerated in the indictment from Indelicato at both the Mini Mart and the Green Apple. Several suppliers testified that when the enumerated Treasury checks received from Indelicato began to bounce, Indelicato agreed to make the checks good. Agent Artone identified a fingerprint on one of the enumerated Treasury checks negotiated by the Green Apple as that of Indelicato.

The most damaging evidence against appellants was provided by the testimony of Costa, the alleged coconspirator who pleaded guilty to possessing and uttering as genuine twenty-four of the sixty-eight checks specified in the indictment. Costa testified that he met Nutile through Indelicato, a longtime friend, and that the meeting started Costa's involvement in the use of his store for the passing of Treasury checks. Costa testified that during a visit by Indelicato and Nutile to his store in Randolph, Nutile asked him as a favor to cash a Treasury check payable to Annie Tiso (Item No. 2 in the indictment). After the check bounced, Costa called Indelicato in an effort to reach Nutile. Indelicato assured him the checks would be taken care of and promised to call Nutile. Nutile subsequently called Costa and gave him similar assurances. Shortly thereafter, a man known only as the "Gypsy" appeared at Costa's store. Costa testified that the Gypsy told him he had been sent by Nutile to take care of the bad check and gave Costa additional Treasury checks (listed in the indictment). Costa testified further that the Gypsy brought him many checks over the next few months, saying each time he had been sent by Nutile. After all the checks bounced, Costa told the Gypsy that he would cash no more checks. Within a short time, Nutile, himself, appeared at Costa's store and urged him to continue cashing the checks. When Costa persisted in his refusal, Nutile showed him a bulge in his coat and said pointedly, "You have a family."

The only evidence presented by either appellant was a hospital record introduced by Nutile showing that he had been an intensive care patient at the Milton, Massachusetts Hospital from October 23, 1974, to November 1, 1974, and an inpatient in the same hospital from November 2, 1974, to November 9, 1974. This evidence was introduced to show that Nutile could not have endorsed the Flanagan check over to Henry Boch at the Green Apple on or about November 6, 1974, as Boch had testified.

### Defendant-Appellant Indelicato

We consider first the appeal of Indelicato. Should we find merit in his position, our decision would concurrently sweep

away the conviction of Nutile on the same counts. Indelicato alleges error by the district court in denying his motion for a directed verdict of acquittal as to Counts II, III, IV, VI, VII, and VIII, the substantive counts of the indictment. Indelicato contends that on each of the six substantive counts the government was required to prove that the checks were stolen from the mails, a burden he says the district court found the government had not met when it granted the motion for a judgment of acquittal as to Count I. If the evidence was insufficient as a matter of law to establish an essential element of the conspiracy count, so the argument goes, it was reversible error to permit the jury to render verdicts as to counts of the indictment that *required the same element to be proven.* However plausible this argument may at first glance seem, it fails, for it is premised on an incorrect assumption that equates the "receptacles owned and maintained by the United States Postal Department" element of Count I with the "stolen from the mail" element of the substantive counts of the indictment.

Count I of the indictment, the conspiracy count, specifically alleged that the Treasury checks in question had "been stolen from a receptacle owned and maintained by the United States Postal Department." In granting the motion for a judgment of acquittal, the district court found

> there was a part of the conspiracy that the defendants would receive checks drawn on the Treasury, said checks having been stolen from a receptacle owned and maintained by the Postal Department and there has been no evidence were [*sic*], in fact owned or stolen from a receptacle owned or maintained by the Postal Department. That calls for speculation. The Court is not willing to state it is sufficient for the purpose of allowing Count 1 to go to the jury.

4. The term "mail" is clearly more expansive than the term "mail receptacle," as those terms are used in § 1708. The mail theft statutes must be read in light of the "realities of delivering and receiving mail in a modern urban environment[.]" *Smith v. United States,* 343 F.2d 539, 542 (5th Cir.), *cert. denied,* 382 U.S. 861,

Contrary to the assertions of appellant, neither the language of the substantive counts nor the statutes on which the counts were based required the government to prove that the checks were stolen from receptacles owned and maintained by the United States Post Office.

■ Counts II, III, and IV each alleged unlawful and willful possession of check(s) "which had been stolen from the *mail*" (emphasis added). The language of these counts clearly does not impose upon the government the same obligation imposed by Count I, *i. e.,* to prove that the checks were stolen from a *receptacle* owned and maintained by the Post Office. While proof of theft of materials from a receptacle owned and maintained by the Post Office obviously would prove theft from the mails, it is equally obvious that proof of theft from the mails would not necessarily prove theft from a postal receptacle.[4] The statute on which Counts II, III, and IV were based reflects the more inclusive nature of the term "mail" by making unlawful the possession of materials stolen "from or out of any *mail,* post office, or station thereof, letter box, *mail receptacle*" (emphasis added). 18 U.S.C. § 1708. This statute has been consistently construed so as not to require direct proof of theft or taking from the mails. *Blue v. United States,* 528 F.2d 892, 894 (8th Cir. 1976); *United States v. Matzker,* 473 F.2d 408, 409 (8th Cir. 1973); *United States v. Hines,* 256 F.2d 561, 563 (2d Cir. 1958). To prove that materials were stolen from the mails, it is sufficient that the government show that the materials were mailed, that the addressees never received them and that the materials were later in the possession of a person who misused them. *United States v. Matzker, supra* at 411. Although the inference is properly drawn from such evidence that

86 S.Ct. 122, 15 L.Ed.2d 99 (1965); *see United States v. Lavin,* 567 F.2d 579, 582–83 (3d Cir. 1977) (includes misdelivered mail); *United States v. White,* 510 F.2d 448, 451 (10th Cir. 1975) (includes letter attached to mailbox by clothespin).

materials were "stolen from the mails," it would not permit the drawing of the more specific inference of theft from a particular mail receptacle. To sustain this more specific inference, the government must adduce, as it initially indicated it would at trial, that materials were deposited in the particular receptacle and disappeared therefrom. When the government presented no evidence at trial concerning a mail receptacle, the district court properly granted the motion for judgment of acquittal as to the conspiracy count. It is clear, however, that the vacuum created by the government's failure of proof on this point does not pull the substantive counts down along with the conspiracy count. In fact, any chance of a similar evidentiary void in regard to the substantive counts was eliminated by the stipulation entered into be defendants-appellants and the government stating that the Treasury checks listed in the indictment were mailed and that, if called to testify, the payees would testify that they neither received nor endorsed the checks listed in the indictment. Since a jury could reasonably infer from the facts stipulated to by the parties and from the evidence of misuse of the checks by appellants that the checks were stolen from the mails, the district court did not err in denying appellant's motion for a judgment of acquittal on Counts II, III, and IV. *United States v. Hines, supra,* 256 F.2d at 564.

 Indelicato mounts the same challenge to his convictions on Counts VI, VII, and VIII of the indictment. We find even less substance to his claim in regard to these counts. Neither the language of Counts VI, VII, and VIII nor the statute on which they are based contain any reference to the mails or to receptacles owned and maintained by the Post Office. The statute prohibits the false uttering of writings with an intent to defraud the United States. 18 U.S.C. § 495. Counts VI, VII, and VIII flesh out this skeleton by specifying the actions of appellants which the government alleged to be violative of the statute. Since the government was not required to offer any evidence pertaining to the mails to prove these counts, the refusal of the district court to grant the motion for judgment of acquittal was clearly correct.[5]

### Defendant-Appellant Nutile

Nutile alleges the commission of five errors by the district court.

1. *The Failure To Dismiss the Indictment Because of Unnecessary and Unreasonable Delay in the Presentation of Charges Against Nutile to the Grand Jury*

 The indictment encompassed the period from August 9, 1974, to April 14, 1975, and was not returned until August 29, 1978, some forty months after the commission of the last acts alleged therein. Nutile acknowledges that the district court's ruling was consistent with the standard enunciated by this court in *United States v. Daley,* 454 F.2d 505 (1st Cir. 1972), in which we held that only where preindictment delay causes actual prejudice and is intentionally employed by the government to gain a tactical advantage does such delay ripen into a due process violation. *Id.* at 508. However, Nutile suggests the *Daley* standard "encourages the government to be dilitory [*sic*] or lax in pressing for the criminal indictment" and urges us to adopt a rule requiring the government to make a diligent, good faith effort to complete the investigation and present the case to the grand jury. He would, in effect, have us overrule *Daley* and make new law. Appel-

---

5. Both appellant Indelicato and the government have discussed the application of the principles of res judicata and collateral estoppel to a multiple count criminal indictment in some detail. We do not reach these issues, since we have found the elements underlying the conspiracy counts and the substantive counts to be factually different. The principles of res judicata and collateral estoppel can apply only when the ultimate facts underlying separate legal premises are the same. *See Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 593, 94 S.Ct. 806, 39 L.Ed.2d 9, *rehearing denied,* 415 U.S. 986, 94 S.Ct. 1582, 39 L.Ed.2d 883 (1974); *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897); *Garner v. Giarrusso,* 571 F.2d 1330, 1335–36 (5th Cir.), *rehearing denied,* 575 F.2d 300 (1978).

lant apparently does not realize that to do so would fly in the teeth of *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), and *United States v. Marion,* 404 U.S. 307, 323–26, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), in which the Court held that a defendant must show actual prejudice before an inquiry need be made into the·reasons for the delay.

> [P]roof of actual prejudice makes a due process claim concrete and ripe for adjudication . . .. [P]roof of prejudice is generally a necessary but not sufficient element of a due process claim . . .. [T]he due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.

*United States v. Lovasco, supra,* at 789–90, 97 S.Ct. at 2048–2049, interpreting *United States v. Marion, supra,* at 324–26, 92 S.Ct. 455, see also *United States v. Lieberman and Shapiro,* 608 F.2d 889 (1st Cir. 1979). When appellant argued the motion to dismiss to the district court, he offered nothing more than vague, generalized contentions of anxiety caused by unnecessary delay. *See United States v. Marion, supra,* at 326, 92 S.Ct. 455. Although the district court observed that appellant had not met his burden of showing prejudice, the government presented a detailed justification for the length of the investigation and the consequent delay. Under these circumstances, the district court correctly denied Nutile's motion to dismiss the indictment. *United States v. King,* 560 F.2d 122, 131 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977).

**2. *The Admission of Hearsay Testimony***

■ Nutile next contends that the district court committed prejudicial error by admitting hearsay evidence pertaining to the existence of a conspiracy without first making the determination required by *United States v. Petroziello,* 548 F.2d 20 (1st Cir. 1977). Since the conspiracy count was dismissed, we need not determine whether the *Petroziello* standards were met. We must,

however, address the claim that the district court committed prejudicial error by failing to instruct the jury, as requested by appellant, to disregard the statements of the Gypsy, allegedly made to Costa at his store. The statements were to the effect that he (the Gypsy) was delivering checks to Costa for cashing on the instructions of Nutile. *Supra* at 5. The court gave no specific instructions as to the Gypsy's statements on the grounds that the jury had been instructed to disregard the conspiracy count and that to instruct specifically on the Gypsy's statements "would highlight the matter." [6]

The government's contention that the district court properly instructed the jury to disregard the hearsay testimony has no basis at all. The district court merely instructed the jury that the conspiracy count had been removed from their consideration and they were not to concern themselves with it. This can hardly be considered to be an instruction to disregard Costa's testimony as to the statements of the Gypsy, or even to be a blanket instruction to disregard all evidence pertaining to the conspiracy count. This was not a case in which the court had drawn bright lines to distinguish the conspiracy count from the substantive counts for the benefit of the jury. *See, e. g., United States v. Richman,* 600 F.2d 286, 296 (1st Cir. 1979). Since it is clear that the jury was not instructed to disregard the hearsay evidence, we must determine whether the district court's failure to do so was prejudicial error.

We first examine the evidence and testimony not linked directly to Costa. Agent Artone testified that Nutile's fingerprints were found on three of the sixty-eight fraudulently negotiated Treasury checks enumerated in the indictment. Several deliverymen and salesmen testified that they supplied Nutile at the Green Apple and received Treasury checks in payment which subsequently bounced. Henry Boch testified that Nutile endorsed the Flanagan

---

**6.** The court instructed the jury on Count I as follows: "Count One of this indictment has been withdrawn from your consideration and

so you are not able to concern yourselves with it."

check with the words "Green Apple" on or about November 6, 1974, and paid for goods with it. While this evidence brought Nutile into the picture, albeit sketchily, it was Costa's testimony that put him clearly in the foreground. Costa testified that Nutile asked him to cash the Tiso check, despite the fact Nutile could have cashed it at his own store. He testified further than when the Tiso check bounced, Nutile assured him over the phone that the check would be taken care of. Costa then testified as to the Gypsy's appearance and to his hearsay statements implicating Nutile. The most damaging part of Costa's testimony was nonhearsay; Nutile came to Costa's store and threatened him if he did not continue to cash checks. Even without the hearsay statements, the jury could infer from the coincidence of the Gypsy's appearance soon after Nutile promised to take care of the Tiso check that the Gypsy came to Costa's store at Nutile's behest. It could also properly infer from Nutile's appearance at Costa's store shortly after Costa told the Gypsy he would cash no more Treasury checks that Nutile was responsible for the Gypsy's presence and knew the checks were stolen and fraudulently endorsed. The hearsay evidence did not justify any conclusions not already warranted by the nonhearsay evidence implicating Nutile. The failure of the district court to instruct the jury to disregard the evidence was, therefore, harmless error. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966); *United States v. Kazni,* 576 F.2d 238, 242–43 (9th Cir. 1978); *United States v. Moten,* 564 F.2d 620, 630–31 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977).

3. *Whether Nutile's Motion for Judgment of Acquittal as to Counts II, III, IV, VI, VII, and VIII Should Have Been Granted*

In assessing the correctness of a denial of a motion for judgment of acquittal, we must review the evidence considered as a whole, including all inferences that may be reasonably drawn therefrom, in the light most favorable to the government. *United States v. Brown,* 603 F.2d 1022 (1st Cir. 1979); *United States v. Gabriner,* 571 F.2d 48, 50 (1st Cir. 1978); *United States v. Scibelli,* 549 F.2d 222, 229 (1st Cir.), *cert. denied,* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977). We must then determine whether a reasonable person could find guilt beyond a reasonable doubt on each of the counts. *Villarreal Corro v. United States,* 516 F.2d 137, 140 (1st Cir. 1975); *United States v. Strauss,* 443 F.2d 986 (1st Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971).

Counts II, III, and IV each alleged violation of the prohibition against the willful possession of materials stolen from the mails, knowing the material to have been stolen. 18 U.S.C. § 1708. To sustain convictions as to these counts, the government had to prove beyond a reasonable doubt that the checks enumerated in each count were stolen from the mails, that the appellant possessed them and that he knew they were stolen, although not necessarily from the mails. *United States v. Hines,* 256 F.2d 561 (2d Cir. 1958). If the government proves that the checks were mailed to the named payees, that they were neither received nor endorsed by the payees, and that the checks were subsequently misused by another party, then it may be properly concluded that the checks were stolen from the mails. *United States v. Lopez,* 457 F.2d 396, 398 (2d Cir.), *cert. denied,* 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 114 (1972); *United States v. Hines,* 256 F.2d 561 (2d Cir. 1958). To permit the drawing of the inference that the appellant knew the checks were stolen, the government must prove only that appellant possessed the stolen checks; from an unexplained possession of stolen property, a juror may properly infer that the possessor knew the property was stolen. *United States v. Barnes,* 412 U.S. 837, 841, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).

Counts VI, VII, and VIII each alleged the violation of 18 U.S.C. § 495,

which prohibits the willful uttering and publishing as true any false, forged, altered or counterfeited writing in an attempt to defraud the United States. To sustain convictions on these counts, the government had to prove beyond a reasonable doubt that appellant attempted to circulate the enumerated checks as genuine, knowing them to have been falsely endorsed, in an attempt to defraud the United States. *United States v. Lonsdale,* 577 F.2d 923, 924 n. 1 (5th Cir. 1978); *United States v. Brown,* 495 F.2d 593, 597 n. 4 (1st Cir.), *cert. denied,* 419 U.S. 965, 95 S.Ct. 226, 42 L.Ed.2d 179 (1974). An attempt to circulate as genuine may be established by proof of an attempt to utilize a check in ordinary commerce. *See United States v. Duvall,* 537 F.2d 15, 17–18 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Brown, supra,* 495 F.2d at 597 n. 4.

 Knowledge that checks have been falsely endorsed may be inferred from the circumstances of a case. *United States v. Calabro,* 467 F.2d 973 (2d Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). The government need not prove that appellant intended to defraud the United States, since appellant is held to be charged with the knowledge that the ultimate loss from the uttering of a falsely endorsed Treasury check will be suffered by the United States. *United States v. Robinson,* 545 F.2d 301, 305 n. 6 (2d Cir. 1976).

 Each of the substantive counts also alleged that appellant aided and abetted Joseph Indelicato in the violation of the above described statutes. 18 U.S.C. § 2. To sustain a conviction on the aiding and abetting portions of these counts, the government had to prove beyond a reasonable doubt that appellant willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about. *Roberts v. United States,* 226 F.2d 464 (6th Cir. 1955), *cert. denied,* 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 817 (1956). Proof of the existence of a substantive

crime is an element of the offense of aiding and abetting. *United States v. McCoy,* 539 F.2d 1050, 1064 (5th Cir. 1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). The government must then have shown some affirmative participation by the appellant. *United States v. Baumgarten,* 517 F.2d 1020 (8th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975).

#### a. *Counts II and VI*

Viewed in the light most favorable to the government, the evidence pertaining to Counts II and VI would justify a reasonable conclusion by a rational juror that Nutile was guilty beyond a reasonable doubt on each count. The stipulation stated that a check payable to Anne E. Flanagan was properly mailed but neither received nor endorsed by her. Henry Boch testified that Nutile endorsed the Flanagan check and paid him for goods with it on or about November 6, 1974. From this evidence, a rational juror could reasonably conclude that the Flanagan check was stolen from the mails, that Nutile possessed it and that he knew it was stolen. From these facts, a juror might also conclude that Nutile used the check to buy goods for the Green Apple and thereby attempted to circulate the check as genuine, knowing it was falsely endorsed, with an intent to defraud the United States.

#### b. *Counts III and VII*

The evidence as to Counts III and VII is as follows. The stipulation stated that a check was properly mailed to Annie M. Tiso but neither received nor endorsed by her. Anthony Costa testified that Nutile asked him to cash the Tiso check as a favor when Indelicato and Nutile visited his store. During this period, Nutile was, according to many witnesses, the operator of the Green Apple, where he might have cashed the Tiso check himself. This evidence would support a conclusion that the check was stolen from the mails and that Nutile knew it was stolen when he possessed it. This evidence would also support a conclusion that Nutile

attempted to circulate the Tiso check as genuine, knowing it to have been falsely endorsed, with the intent of defrauding the United States. This district court did not err in denying Nutile's motion for judgment of acquittal as to Counts III and VII.

### c. Counts IV and VIII

Counts IV and VIII, unlike the previous pairs of counts, did not mirror each other perfectly. Count IV alleged that Nutile possessed sixty-seven Treasury checks which had been stolen from the mails, knowing them to have been stolen. Count VIII alleged that Nutile uttered and published as true forty-two of the sixty-seven Treasury checks, knowing them to have been falsely endorsed, with the intent of defrauding the United States. The checks included in Count IV but not included in Count VIII were those negotiated by Anthony Costa. Viewed in the light most favorable to the government, the evidence would support a reasonable determination by a rational juror that Nutile was guilty on both counts beyond a reasonable doubt. The stipulation stated that the sixty-seven checks were properly mailed to the named payees but neither received nor endorsed by them. Each of the checks was subsequently negotiated by one or more of the following stores: the Mini Mart; the Green Apple; and Costa's store. A number of vendors testified they received several of the enumerated Treasury checks from the Green Apple and that they believed the store was operated by Nutile. Secret Service Agent Artone testified that fingerprints found on two of the checks endorsed "Green Apple" matched those of Nutile. Vendors also testified that Nutile refused to make good on Treasury checks passed by the Green Apple when they bounced. From this evidence, a juror might properly conclude that the checks were stolen from the mails, that Nutile possessed at least two of them and that he knew they were stolen.

The testimony of several vendors established that Nutile either owned or operated the Green Apple and that the others at the store worked for him. Many of the Trea-sury checks enumerated in Count VIII were received by suppliers from the Green Apple in payment for goods. Nutile's fingerprints were found on two of the Treasury checks. Several vendors testified that Nutile refused to make good on Treasury checks passed by the Green Apple that bounced. A juror could conclude from this evidence that Nutile attempted to circulate some of the checks enumerated in Count VIII as genuine, knowing them to have been falsely endorsed, with an intent to defraud the United States.

### 4. Whether the District Court Erred in Admitting Evidence of Nutile's Refusal To Pay Back Money to Vendors Who Were Given Fraudulently Endorsed Treasury Checks

Nutile contends it was error to allow two vendors to testify that he refused to make good on Treasury checks that bounced because there was no evidence Nutile gave either vendor any Treasury checks. We think that appellant, in addition to misconstruing the facts, urges too narrow a view of the relevancy of the vendors' testimony. Although only one vendor, Henry Boch, testified that he saw Nutile endorse a check enumerated in the indictment, there was a considerable amount of circumstantial evidence that could be found to prove that Nutile operated the Green Apple and was responsible for tendering third party checks negotiated by the store in the purchase of goods.

The first vendor, Robert Walsh, an employee of West Lynn Creamery, testified that Nutile never made good on a bad check given to the Creamery. Frederick Trecartin, the Creamery route driver responsible for the route on which the Green Apple was located, testified that the checks about which Walsh testified all came from the Green Apple. The second vendor, Dexter Segal, an employee of the Broadway Tobacco and Candy Company, testified that he frequently sold goods to Nutile at the Green Apple, received bad checks in payment for some goods and believed Nutile owned the Green Apple. The testimony of

both vendors was relevant to show Nutile's knowledge that the checks were falsely endorsed, his intent not to pay and, therefore, to defraud the United States, and the existence of a common plan or scheme to pass falsely endorsed Treasury checks through the Green Apple to suppliers of the store. Fed.R.Evid. 404(b); *see United States v. Rajewski,* 526 F.2d 149, 159 (7th Cir. 1975), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976); *United States v. Fearns,* 501 F.2d 486, 491–92 (7th Cir. 1974).

5. *Whether Nutile's Motion for a New Trial Should Have Been Granted*

 Motions for a new trial are directed to the broad discretion of the trial judge, who may weigh the evidence and evaluate the credibility of witnesses in considering such a motion. *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied sub nom. Tremont v. United States,* 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970). Thus, the question is whether the district court abused its discretion in refusing to grant appellant's motion for a new trial *United States v. Zannino,* 468 F.2d 1299, 1303 (1st Cir. 1972), *cert. denied,* 410 U.S. 954, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). The remedy of a new trial is sparingly used, and then only where there would be a "miscarriage of justice . . . and where 'the evidence preponderates heavily against the verdict.'" *United States v. Leach, supra,* at 1111. Neither circumstance exists in this case. Nutile presented only one piece of evidence at trial, a hospital record showing his hospitalization at the Milton, Massachusetts Hospital during the same time, November 5 or 6, 1974, when he was supposed to have given a stolen check to Henry Boch. Although this record tended to contradict Boch's testimony concerning the date of the passing of the Flanagan check by Nutile, Boch's testimony was a matter of credibility on which we must defer to the district court. *Marshall v. United States,* 141 U.S.App.D.C. 1, 2, n. 2, 436 F.2d 155, 156 n. 2 (D.C.Cir.1970). We note that it is not outside the realm of possibility for a patient in a hospital to leave the premises or for records to be altered or fictionalized. The remainder of the evidence presented in support of seven counts of the indictment was unrefuted by either defendant. While the defendants were under no obligation to present evidence, neither the district court nor the jury were under any obligation to conjure up exculpatory evidence for them. Since we have found the district court did not err in letting the substantive counts go to the jury, and since the appellant presented virtually no evidence, we can hardly find that the weight of the evidence required a new trial. The district court did not err in refusing to grant Nutile's motion for a new trial.

*Affirmed.*