**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Edward KUZNIAR and George Pistas, Defendants–Appellees.**

No. 88–2790.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1989.

Decided Aug. 7, 1989.

Rehearing and Rehearing En Banc Denied Oct. 24, 1989.

---

Michael T. Mullen, Asst. U.S. Atty., Chicago, Ill., for U.S.

Dean P. Karlos, Karlos & Associates, John J. Armellino, Jr., Chicago, Ill., for Edward Kuzniar and George Pistas.

Before FLAUM and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

After a jury trial in which the defendants were found guilty on twelve counts of arson, mail fraud, and conspiracy to commit mail fraud and arson, the district court granted the defendants a new trial on seven of the counts and acquitted them on the other five. We find that the district court abused its discretion in granting the defendants a new trial on the seven counts. Further, we believe the district court erred in acquitting the defendants on the remain-

ing counts. Therefore, we reverse, reinstate the jury's verdict and remand to the district court for sentencing.

## I.

## A.

Defendants Edward Kuzniar and George Pistas were each charged in an indictment, and subsequently in a superseding information, with one count of committing arson, in violation of 18 U.S.C. § 844(i), one count of conspiracy to commit arson and mail fraud, in violation of 18 U.S.C. § 371, and ten counts of mail fraud, all violating 18 U.S.C. § 1341. The defendants pleaded not guilty and were tried before a jury.

At trial, evidence was introduced to show the following. Defendants Kuzniar and Pistas were partners in a business called A Apple Glass and Board–Up Inc. ("A Apple") whose offices were located at 4311 West Fullerton Avenue in Chicago. In January 1984, the defendants acquired a run-down building located at 4120 West Chicago Avenue in Chicago (the "Chicago Avenue building" or "building"). The defendants obtained the building, which had a price of $70,000, with the intention of turning it into a commercial flea market. Shortly after the purchase, the defendants obtained insurance from the Traveler's Insurance Company ("Traveler's") for the building in the amount of $600,000, the alleged replacement value of the building.

Extensive renovations were made to the building, including the introduction of security devices, and the flea market opened for business in June 1984. In the fall of 1984 the flea market was closed for the season, never to reopen. During the subsequent winter defendant Kuzniar apparently encountered financial difficulties. In response, the defendants, on at least three occasions, unsuccessfully attempted to sell their interest in the building for approximately $100,000.

On April 9, 1985, a fire destroyed a significant portion of the Chicago Avenue building. The government introduced substantial circumstantial evidence to show that the fire was the result of an arson

committed by the defendants. Mary Volpee, a resident of the area near the building, testified that on the morning of the fire she saw a man carrying a five-gallon gasoline can exit the building and pour some kind of liquid at the base of the building. Ms. Volpee testified that after a quick stop at her home, she returned to the building and saw that a second man had joined the first. The second man also carried a gasoline can, and both men stood watching while smoke began to filter out of the building. Ms. Volpee identified the first man as defendant Pistas.

Ms. Volpee's daughter, Linda Pamonicutt, was also present near the building at the time of the fire. She testifed that she saw the first man exit the building as smoke began to emanate from its apertures. She went to a nearby grill to call the fire department only to find a husky man already using the phone. The man assured Ms. Pamonicutt that he had already called the fire department. Ms. Pamonicutt identified the first man as defendant Pistas and, after some difficulty, identified the second, husky man as defendant Kuzniar.

Several of the firemen who fought the blaze at the building were called to testify by the government. One of the firemen testified to seeing Ms. Volpee, or at least a woman fitting her description, at the scene. Another testified to the difficulty the firemen encountered in entering the building, which the defendants could have diminished by furnishing keys, as well as their surprise at not hearing any alarms upon entering the building despite the presence of security devices. Finally, Richard Sinnott, a battalion chief present at the fire, testified that Kuzniar told him that it didn't matter whether the building was saved because he was going to tear it down anyway.

The government also introduced the testimony of several experts in the area of arson investigation. Although the experts disagreed in some particulars, they each testified to the presence of petroleum distillate in samples of the debris taken from the building and to other peculiar charac-

teristics of the fire. For example, the experts testified that they found an identifiable pour pattern for fire accelerant on the floor of the building and "beading" of the copper in the building, a sign of abnormally high temperatures during the fire. Both the presence of an accelerant and the beading are consistent with an arson theory. The experts did not completely discount the possibility of a natural origin for the fire but, in the words of one of the experts, thought such a possibility "highly improbable" or "virtually impossible."

The district court's difficulty with the government's case stems from the testimony of government witness Robert Arens Jr., and the defendants' evidence contradicting that testimony. Judge Marshall found Arens' testimony unbelievable as a matter of law and decided that permitting the jury to hear the testimony so prejudiced the defendants that, in the interests of justice, a new trial was required.

### B.

Robert Arens Jr., a teenager at the time of the events in question, worked at A Apple as part of a high school work/study program. Arens claimed that he was employed at A Apple's Fullerton Avenue office performing general maintenance and clean-up from October 1984 through the middle of January 1985. Arens testified that in January 1985, while doing some cleaning in the hallway outside Kuzniar's office, he overheard a conversation between Kuzniar and Pistas regarding the Chicago Avenue building. Kuzniar reportedly mentioned the problems they were having with the Chicago Avenue building and then asked Pistas what they were going to do. Pistas replied that he didn't know what they should do and repeated that answer when Kuzniar persisted. Finally, according to Arens, Kuzniar pulled out a cigarette lighter, drew a flame and stated "I think this is what we should do." Pistas asked whether that was a good idea and Kuzniar replied that it was "the only way." At that point, Pistas saw Arens, came storming out of the office, and fired him on the spot.

Arens further testified that within two weeks of the firing he had found a new job working for Kevin Doublin at Chicago's Finest Board–Up Service Inc. Doublin, testifying after Arens, corroborated this part of Arens' testimony. Doublin also testified that Arens told him that he had been fired from his previous job because he overheard a conversation between his former bosses.

On cross-examination, Arens was forced to admit that he had previously told an investigator that the conversation he overheard had occurred in March 1985, rather than in January of that year. Also, after denying that his employment with A Apple was actually in March 1984, Arens was confronted with time cards and pay stubs which showed that he did work for the company in that time period. Arens denied endorsing most of the checks and claimed that the time cards were forgeries. Finally, in an exchange regarding some visits he made to the Chicago Avenue building, Arens claimed that he was at the building before the flea market opened, placing the visits sometime before June 1984.

Defendants introduced other evidence to show that Arens actually worked at A Apple in March 1984. That evidence established that the only checks issued to Arens were dated March 1984 and that A Apple paid all its employees by check. Testimony was also introduced from Paul Zack, the operator of Pioneer Maintenance Service, who claimed that he alone provided maintenance and clean-up services to A Apple during the period between October 1984 and January 1985.

At the close of trial, the defendants moved for a judgment of acquittal claiming that Arens' testimony was perjured. The district court, although it stated that Arens' testimony was unworthy of belief, allowed the case to go to the jury. The district court warned the government, however, that it should either withdraw Arens' testimony or tell the jury to disregard it. In closing arguments, however, both the government and the defendants discussed Arens' testimony and argued, respectively, for and against his credibility. The jury

subsequently convicted the defendants on all counts.

In post-trial motions, the defendants again asked for a judgment of acquittal based on Arens' "inherently incredible" testimony and also asked for a new trial based on newly discovered evidence. The newly discovered evidence was an affidavit from Louie Gattorna, the teacher at Arens' school responsible for the work/study program. The affidavit stated that Arens was not in the work/study program between October 1984 and January 1985, and that Gattorna had never supervised Arens. In response to this submission, the district court took the unusual step of requesting additional evidence regarding Arens' credibility.

In the evidentiary hearing that followed, the government introduced evidence that Arens actually was in the work/study program in the relevant period. Also, an expert in handwriting identification testified that Arens had endorsed only one of the checks purportedly given to him by A Apple in March 1984. Finally, Arens parents testified that they also did not endorse the checks in question. They further testified that their son had worked for A Apple and, within a week of being fired from that job, had obtained a new job with Kevin Doublin.

Faced with all of this conflicting evidence, the district court granted the defendants' motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The district court initially noted that it had the discretion to strike evidence that no reasonable person could believe. After concluding that Arens testimony was "unbelievable as a matter of law" and also "dramatic and damaging," the court held that a new trial was required "in the interests of justice." The court specifically stated, however, that the government did not have reason to know that Arens would testify falsely until after the completion of his cross-examination.

## II.

■ The decision to grant a new trial under Federal Rule of Criminal Procedure 33 is a matter of discretion for the district court and will be disturbed on appeal only if the district court abused that discretion. *United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984). Rule 33 states that a trial court "may grant a new trial ... in the interests of justice." The Rule does not define "interests of justice" and the courts have had little success in trying to generalize its meaning. Nevertheless, courts have interpreted the rule to require a new trial "in the interests of justice" in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial. *United States v. Simms*, 508 F.Supp. 1188, 1202 (W.D.La.1980).

Of relevance to this case, a new trial has been granted "in the interests of justice" where evidence was erroneously permitted to go to the jury, substantially affecting the rights of the accused. This apparently was the rationale followed by the district court in granting a new trial in this case. The district court believed that it was obliged to keep Arens' testimony from the jury because it was "unbelievable as a matter of law." Having allowed this "dramatic and very damaging" evidence go to the jury, the court held that "the interests of justice" required a new trial.

■ It is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); *United States v. D'Antonio*, 801 F.2d 979, 982 (7th Cir. 1986). In general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial. *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir.1979); *Marshall v. United States*, 436 F.2d 155, 156 n. 1 (D.C. Cir.1970). Where a witness' testimony is such that reasonable men could not have believed the testimony, however, then exceptional circumstances are present and the district court may take the testimony away from the jury. *Holland v. Allied Structural Steel Co., Inc.*, 539 F.2d 476, 483 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97

S.Ct. 1136, 51 L.Ed.2d 557 (1977). The exception is an extremely narrow one, however, and can be invoked only where the testimony contradicts indisputable physical facts or laws. *Zollman v. Symington Wayne Corporation,* 438 F.2d 28, 31 (7th Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971); *United States v. Smith,* 592 F.Supp. 424, 441 (E.D.Va.1984), *vacated on other grounds,* 780 F.2d 1102 (4th Cir.1985).[1]

■ In this case, the district court believed that it had erred in failing to invoke this exception and keep Arens' testimony from the jury. We do not agree because we find that the exception, which is extremely narrow, was not applicable to this case. Indeed, we believe that it would have been an abuse of discretion had the district court excluded Arens' testimony.

There is no doubt that Arens' credibility was subject to strong attack. The defense effectively showed that Arens was lying when he stated that he did not work at A Apple in the spring of 1984. The defense also submitted substantial evidence to show that Arens did not work for the defendants at the time he allegedly overheard their incriminating conversation. Nevertheless, the defense did not prove that it was impossible, in the sense that it would violate immutable laws of nature, for Arens to have heard the alleged incriminating conversation. In fact, more than simply having an abstract possibility of being truthful, Arens' testimony was actually corroborated in some respects by several independent sources. Under those circumstances, nothing exceptional was present to justify preventing Arens' testimony from being heard by the jury.

■ In sum, the district court was correct to permit Arens' testimony to be evaluated by the jury. Accordingly, it was an abuse of discretion for the district court subsequently to grant a new trial on the grounds that the testimony should have been kept from the jury.[2]

## III.

The district court acquitted the defendants on five of the substantive mail fraud counts.[3] The only ground cited by the dis-

1. The dissent asserts that there are three separate standards for determining whether exceptional circumstances are present to justify a judge's decision to keep testimony from the jury. In our view, these three standards are nothing more than three different formulations of the same idea; *i.e.,* that testimony which does not contradict the physical laws of nature cannot be shielded from the jury. Indeed, the cases cited by the dissent stand for this very proposition. *See, e.g., United States v. Rivera,* 775 F.2d 1559, 1561 (11th Cir.1985), *cert. denied,* 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986) (Testimony is "unbelievable on its face" when the witness testifies " 'as to facts that [he or she] physically could not have observed or events that could not have occurred under the laws of nature.' ").

2. Both the government and the defendants speculate that the district court may have ordered a new trial on the basis of newly discovered evidence in the form of Gattorna's post-trial affidavit. We do not read the district court to have granted the new trial on that ground. In any event, Gattorna's affidavit would not have justified granting a new trial since there was no impediment to presenting the evidence at trial and, even if there were, the evidence merely impeached the testimony of a government witness. *United States v. Tucker,* 836 F.2d 334, 336

(7th Cir.1988) (to obtain new trial on basis of newly discovered evidence, defendant must show, among other things, that the evidence is not merely impeaching and could not have been discovered sooner with due diligence).

Nor is this a case where a new trial was justified on due process grounds because the government knowingly used perjured testimony. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Kaufmann,* 783 F.2d 708, 709 (7th Cir.1986). Initially, as noted above, we are not convinced that Arens' testimony was perjured. More importantly, the district court explicitly recognized that the government did not have reason to know that Arens' testimony was false until, at the earliest, the completion of his cross-examination.

3. The mail fraud statute, 18 U.S.C. § 1341, states, in pertinent part, that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so ... knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years or both.

trict court to support its decision was that "the mailings ... were not made in furtherance of the scheme to defraud...." We have little difficulty in finding that this decision was erroneous based on our past precedents and the Supreme Court's recent decision in *Schmuck v. United States,* ——— U.S. ———, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).

The five counts on which the district court acquitted the defendants alleged the following mailings: (1) a letter from an attorney for Traveler's to defendant Pistas informing Pistas that the company required him to sit for a deposition and produce supporting documents in order to collect on the fire insurance policy; (2) a letter virtually identical to that described in (1) but sent to defendant Kuzniar; (3) a letter from defendants' insurance adjuster to an attorney for the insurer confirming a request for additional time to produce documents supporting defendants' claim; (4) a letter from an attorney for Traveler's requesting that the depositions of the defendants proceed within thirty days and that documents be produced within seven; and (5) a reply from the defendants' attorney to the letter described in (4) which stated that a date for the depositions could be set up with the attorney's secretary.

 In a prosecution for mail fraud the government must show that the defendant[s] knowingly caused the mails to be used in furtherance of a scheme to defraud or to obtain money through false or fraudulent pretenses. *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986). Initially, we note that it makes no difference that the defendants did not personally mail the letters in question. The mail fraud statute requires only that a defendant "causes" the mail to be used. A defendant "causes" the mail to be used when he or she acts "with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen...." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). In this case,

having filed a claim with Traveler's based on the fire, the defendants were contractually obligated to sit for depositions and submit documents to support their claim. Thus, the defendants could reasonably foresee that their actions would result in correspondence of the sort addressed in counts eight through twelve.

To meet the "in furtherance" requirement of the statute, the mailings need not be essential to the success of the scheme; "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme'...." *Schmuck,* 109 S.Ct. at 1447 (quoting *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916)); *see also Draiman,* 784 F.2d at 251.

The alleged scheme in this case was to defraud Traveler's out of money by setting fire to the Chicago Avenue building and then collecting on the insurance policy which covered the building. The scheme required that the defendants, pursuant to their insurance contract with Traveler's, submit to depositions and provide documentary support for their claim of loss. Each of the mailings was directed, in one way or another, at the defendants' obligation under the policy to support their insurance claim. Had the defendants failed to show up for the depositions which were discussed in the letters or failed to provide supporting documents, the insurance company would not have paid and the scheme would have failed. Thus, the correspondence aimed at setting dates for the depositions and production of documents was incident to an essential part of the defendants' scheme.

The defendants claim that rather than being in furtherance of the scheme, these letters could at best have hindered the scheme by making it more difficult for the defendants to collect the insurance proceeds. The Supreme Court rejected an identical argument in *Schmuck.* 109 S.Ct. at 1449–1450. As the Court stated: "The mail fraud statute includes no guarantee that the use of the mails for the purpose of

executing a fraudulent scheme will be risk free." *Id.* Thus, each of the letters discussed in counts eight through twelve were "incident" to an essential part of the defendants' scheme and met the "in furtherance" requirement of the statute.

## IV.

For the reasons discussed above, we reverse the decision of the district court, reinstate the jury's verdict as to all counts, and remand to the district court for sentencing.

ESCHBACH, Senior Circuit Judge, concurring in part and dissenting in part.

Although I accept the facts as set forth in the majority's opinion, I feel an elaboration on the procedural history and posture of this case is necessary. The defendants were charged in a superseding information with one count of conspiracy to commit arson and mail fraud (count 1), one count of arson (count 2) and ten counts of mail fraud (counts 3–12). After the jury found the defendants guilty on all counts, the defendants filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and a motion for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. The district court granted the motion for judgment of acquittal with respect to counts 8–12 on the ground that the mailings alleged in those counts were not made in furtherance of the scheme to defraud. The court also granted the defendants' motion for a new trial with respect to counts 1–7 because the jury had heard testimony which was unbelievable as a matter of law. The government now appeals from the district court's decision.

In its opinion, the majority holds that the district court abused its discretion in granting the defendants' motion for a new trial with respect to counts 1–7 and erred in granting the defendants' motion for judgment of acquittal with respect to counts 8–12. Thus, the majority reinstates the jury verdict on all twelve counts. Because

I disagree with the majority's view that the district court abused its discretion in granting the motion for a new trial as to counts 1–7, I respectfully dissent. Moreover, although I agree with the majority that the district court erred in granting the defendants' motion for judgment of acquittal as to counts 8–12, I do not believe the jury verdict should be reinstated on those counts. Rather, the defendants should receive a new trial on those counts.

Rule 33 of the Federal Rules of Criminal Procedure allows the district court to grant a defendant's motion for a new trial "in the interest of justice." Although the rule does not define "in the interest of justice," it is well accepted that the trial judge has broad powers to determine whether to grant a new trial. *See, e.g., United States v. Rodriguez,* 738 F.2d 13, 17 (1st Cir.1984); *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979); *see also* 3 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 551, at 236–37 (1982) ("[T]he trial court has broad powers to grant a new trial if for any reason it concludes that the trial has resulted in a miscarriage of justice."). In recognition of the district court's broad power to review a motion for a new trial, our court, as the majority correctly notes, cannot reverse the district court's decision unless it amounts to an abuse of discretion. *United States v. Goodwin,* 770 F.2d 631, 639 (7th Cir.1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986); *United States v. Nero,* 733 F.2d 1197, 1202 (7th Cir.1984). Under this standard of review, the government bears a *heavy burden* in trying to show that the district court abused its discretion. *See, e.g., Jones v. Hamelman,* 869 F.2d 1023, 1027 (7th Cir. 1989); *United States v. Kaufmann,* 803 F.2d 289, 291 (7th Cir.1986).

In this case, Judge Marshall found the testimony of one of the government's witnesses, Robert Arens, to be "unbelievable as a matter of law." District Court's Memorandum Opinion at 14. Because the jury was allowed to consider the "dramatic and

very damaging" testimony of Arens in reaching its verdict, Judge Marshall concluded that the interest of justice required a new trial for the defendants on counts 1–7. *Id.*

I agree with the majority that, absent extraordinary circumstances, the credibility of a witness is for the jury to decide. See *United States v. Allen,* 797 F.2d 1395, 1399 (7th Cir.), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986); *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). However, courts have recognized that extraordinary circumstances do occasionally exist when the trial judge should keep the testimony of a witness from the jury because it is unbelievable as a matter of law. For example, a witness' testimony can be considered incredible as a matter of law if it defies physical laws. *See United States v. Carrasco,* 830 F.2d 41, 44 (5th Cir.1987); *Zollman v. Symington Wayne Corp.,* 438 F.2d 28, 31–32 (7th Cir.), *cert. denied,* 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971). Additionally, a court will consider testimony to be unbelievable as a matter of law if no reasonable juror could believe it. *See United States v. Gutman,* 725 F.2d 417, 435 (7th Cir.) (Coffey, J., dissenting), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 183 (1984); *Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 483 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977); *see also* 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 601[01], at 601–10 (1988) ("[T]he trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably believe the witness...."). Finally, testimony that is incredible on its face can be considered unbelievable as a matter of law. *See United States v. Rivera,* 775 F.2d 1559, 1561 (11th Cir.1985), *cert. denied,* 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986); *United States v. Blasco,* 581 F.2d 681, 685 n. 7 (7th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978). Thus,

contrary to what the majority would lead one to believe, testimony can be incredible as a matter of law even if it does not "violate immutable laws of nature."

Therefore, the precise issue before our court is whether Judge Marshall abused his discretion in granting a new trial because he found that extraordinary circumstances existed which rendered Arens' testimony unbelievable as a matter of law. At trial, Arens testified that he worked for the defendants between October 1984 and January 1985 and that he overheard a conversation between the defendants in January 1985 which strongly suggested that they planned to torch their building. The government presented some additional testimony that helped to corroborate Arens' claim that he worked for the defendants in January 1985. As part of their evidence, however, the defendants produced paychecks and time cards which showed that Arens worked for them in the spring of 1984 and therefore, could not possibly have heard a conversation between them in January 1985. The defendants also showed, contrary to Arens' assertions, that no paychecks were issued to Arens in January 1985 and that he was not listed as being in his school's work program. Indeed, the evidence presented by the defendants at trial was so overwhelming that the government concedes in its brief that the defendants repeatedly impeached Arens on the substance of his testimony and on his overall credibility. *See* Brief for Appellant at 29.

Whether Arens' testimony is unbelievable as a matter of law is a close issue that Judge Marshall could have resolved either way. In reviewing this issue on appeal, I note that Judge Marshall, an experienced and conscientious trial judge, presided over both the trial and the hearing on the motion for a new trial. He observed Arens' testimony and the jury reaction to it. In this situation, Judge Marshall was "in a much better position than we, as an appellate court, to judge the merits of the motion [for a new trial]." *United States v. Draper,* 762 F.2d 81, 83 (10th Cir.1985).

Therefore, under the particular circumstances of this case, I cannot say that the government met its heavy burden of showing that Judge Marshall abused his discretion in granting the defendants' motion for a new trial. Accordingly, I would affirm Judge Marshall's decision to grant the defendants a new trial on counts 1–7.

In its opinion, the majority also holds that the district court erred in granting the defendants' motion for judgment of acquittal as to counts 8–12. In reversing the district court on this issue, the majority relies primarily on the recent Supreme Court case of *Schmuck v. United States,* — U.S. —, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Of course, the district court did not have the benefit of the *Schmuck* decision when it rendered its opinion in this case. Nevertheless, I agree with the majority that the district court erred in granting the defendants' motion for judgment of acquittal with respect to counts 8–12. Each of those counts adequately alleges a mailing that was at least incidental to an essential part of the scheme. *See id.* 109 S.Ct. at 1447; *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986). However, because I believe the district court did not abuse its discretion in granting a new trial with respect to counts 1–7, I cannot agree with the majority's decision to reinstate the jury's verdict on counts 8–12. Instead, I believe that in the interest of justice, the defendants should also receive a new trial on counts 8–12 because Arens' testimony infected the entire trial.