**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Mildred L. PALMER and Richard O.
Morrison, Defendants–Appellants.**

**Nos. 88–2073, 88–2074.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1988.

Decided Dec. 22, 1988.

Rehearing and Rehearing En Banc
Denied Jan. 18, 1989.

Gregory Pelini, Pelini & Sheffler, Glenn Stanko, Champaign, Ill., for defendants-appellants.

Frances C. Hulin, U.S. Atty., Danville, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

About a month after settling into a house, Mildred Palmer found in her mailbox three envelopes addressed to Clifton Powell, Jr., the former occupant. Instead of returning the envelopes to the Postal Service, Palmer opened them. She found three checks (technically, warrants on Illinois's treasury)—no surprise, for the envelopes in which Illinois mails checks are distinctive. The district court described what happened next:

> Richard Morrison was present when Palmer brought the mail into the house and knew she had received the state warrants. Palmer and Morrison discussed negotiating the warrants and getting the proceeds. Someone endorsed Clifton Powell, Jr.'s name without his authority on the reverse side of each warrant. The warrants were then delivered by Morrison to a man named Lawrence Armour, Sr. Armour had something which neither Palmer nor Morrison had: a bank account. For a fee Armour negotiated the three state warrants through his bank account and returned the balance of the proceeds to Morrison who shared them with Palmer.

The United States charged Palmer and Morrison with possession of checks stolen from the mails, in violation of 18 U.S.C. § 1708. The jury found them guilty; the judge suspended imposition of sentence and placed each on five years' probation. We must decide whether converting the contents of an envelope violates § 1708 when the envelope was delivered to an outdated address.

Section 1708 provides in part:

> Whoever steals ... from or out of any mail, post office, or station thereof, letter box, mail receptacle, or any mail route or other authorized depository for mail matter, or from a letter or mail carrier, any letter, ... or abstracts or removes from any such letter ... any article or thing contained therein ... [or] has in his possession, any letter ... or any article or thing contained therein, which has been so stolen, ... knowing the same to have been stolen, ... [s]hall be fined not more

than $2,000 or imprisoned not more than five years, or both.

The prosecutor believes that the three envelopes were stolen from the "mail" because they had not been delivered to Powell. The defendants emphasize that the envelopes had been delivered to the address they bore and that when Palmer took the envelopes out of the mail box, she did not intend to steal them—for she reasonably believed that everything in the mailbox was hers. When Palmer discovered that the envelopes were not, she purloined their contents, but by then the envelopes were no longer part of the mail. If the checks had been addressed to Palmer and had been stolen from her on the way to the bank, the theft would not have violated § 1708; no more does her larceny, she insists.

Palmer and Morrison were not charged with stealing out of a "letter box [or] mail receptacle", which would make Palmer's intent at the time of the withdrawal pertinent. They were charged with stealing out of the "mail". The parties agree that "mail" means the postal system, not a piece of mail. How far does the postal system extend? One might say that it begins when the envelope is dropped into a depository and ends when the letter carrier puts it in a mailbox. There is substantial support for the conclusion that when the postal carrier delivers an envelope to the current residence of the addressee, the "mail" is at an end. A good example is *United States v. Logwood*, 360 F.2d 905 (7th Cir.1966), in which the postal carrier delivered to the landlady the mail for all tenants of a building that lacked letter boxes. The landlady regularly distributed the mail to the tenants, or they retrieved the mail from her apartment. One day the landlady's son filched an envelope from her window sill. We concluded that this theft did not violate § 1708 because the postal system had delivered the mail to the right person at the right address; the "mail" ended when the Postal Service finished its job.

■ What happens, however, when the mail miscarries? Suppose the mail is mis-

delivered—is left at an address other than the one on the envelope? Or suppose the mail is misaddressed—bears an address other than the residence of the person to whom it was sent? In either case the postal system's job is not done. If the envelope is handed back (as it should be), the postal system will deliver it to the correct address without new postage; if it does not know the proper address, it will return the envelope to the sender. The unintended recipient may not keep or open the envelope in either event, because

> Whoever takes any letter ... which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, ... or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1702. Palmer opened a letter that had been in the custody of the postal system, before it had been delivered to Powell, and so violated § 1702. See *United States v. Ashford*, 530 F.2d 792, 795–96 (8th Cir.1976). But she was charged with violating § 1708, not § 1702, and the application of § 1708 to misaddressed mail is not so clear.

Courts routinely hold that § 1708 forbids the conversion of misdelivered mail. E.g., *United States v. Lavin*, 567 F.2d 579 (3d Cir.1977); *United States v. Anton*, 547 F.2d 493 (9th Cir.1976); *United States v. Davis*, 461 F.2d 83 (5th Cir.1972). These courts observe that misdelivery by the postal system is an error that the system is obliged to correct; until it has done so, the item remains in the mail for purposes of § 1708. These three courts believe, however, that misaddressed mail is a different matter. *Lavin*, 567 F.2d at 581 n. 6 (dictum); *Anton*, 547 F.2d at 495 n. 2 (dictum); *Allen v. United States*, 387 F.2d 641 (5th Cir.1968); *Goodman v. United States*, 341 F.2d 272 (5th Cir.1965). See also *Ashford* (to the same effect by implication). The Ninth Circuit said in *Anton* that if the former resident filed a change-of-address form, then the envelope remains part of the mail notwithstanding its delivery to the for-

mer address, while if the addressee did not file the form, then delivery to the address is the end of the "mail" for purposes of § 1708. The record does not reveal whether Powell filed a change-of-address form, and the jury was not told that it had to find that he did in order to return verdicts of guilt. *Allen* and *Goodman* draw no such line and are indistinguishable from our case.

Two other circuits believe that an item remains in the "mail" until it reaches the addressee or is returned to the sender. *United States v. Douglas*, 668 F.2d 459 (10th Cir.1982); *United States v. Indelicato*, 611 F.2d 376 (1st Cir.1979). *Indelicato* did not consider misaddressed mail as a separate category but stated the elements of the § 1708 offense in a way that covers misaddressed envelopes. The First Circuit held that in the case of checks, the government need prove only that "the checks were mailed to the named payees, that they were neither received nor endorsed by the payees, and that the checks were subsequently misused by another party". 611 F.2d at 384; see also *id.* at 381. The Tenth Circuit sustained a conviction under § 1708 in a case of misaddressed mail. The postal system delivered an envelope to the former address of one who had recently moved. The new occupant took the envelope out of the mail box "and later 'clothes-pinned' it, unopened, with the check inside, to a metal rod attached to the mailbox." 668 F.2d at 461. The defendant took the envelope and negotiated the check. Palmer and Morrison treat *Douglas* as a case in which the "mail" ended with the initial deposit in the mail box and began anew when the occupant clipped the envelope to the post, thus mailing it a second time. This is not how the Tenth Circuit saw things, however. It concluded that § 1708 "should be interpreted broadly to effectuate a 'manifest legislative intent to protect the mails.'" *Ibid.* It therefore not only treated the metal rod as the equivalent of a mail receptacle but also concluded: "An item does not cease to be mail within the custody of the postal system until it is delivered to the proper addressee." *Id.* at 461 n. 3.

■ We must decide whether to follow the First and Tenth Circuits, which apply § 1708 to misaddressed mail; the Ninth Circuit, which applies § 1708 to misaddressed mail if a change-of-address form is on file; or the Third and Fifth Circuits, which hold that § 1708 does not apply to mail after it reaches the address on the envelope. Every court that has spoken to the question has held (correctly, we believe) that § 1708 covers misdelivered mail; no court has given a persuasive reason for distinguishing misdelivered from misaddressed mail; we therefore conclude that § 1708 applies to misaddressed mail, and follow the First and Tenth Circuits.

From the perspectives of senders, addressees, (unintended) recipients, and the postal system, misdelivered and misaddressed mail are the same. The sender wants mail to go to the right person at the right address; an out-of-date address and an incorrect address (perhaps because of a typographical error) have the same consequences for the sender as a goof by the postal system. The intended addressee does not care whether the sender's use of an outdated address or an error by a letter carrier thwarts delivery. The unintended recipient learns in either case—from the name of the addressee, the address on the envelope, or both—that the item was meant for someone else. The recipient must return to the postal system an envelope sent to another, no matter the address written on it. The Postal Service sees old or incorrect addresses, like bungled routings, as hindrances to delivery; in any of these cases the Postal Service will attempt to deliver to the addressee and, if unable to do so, will return the item to the sender without charging additional postage (at least when the item is first-class mail, which these three envelopes were).

If misaddressed and misdelivered mail are identical from the perspectives of senders, addressees, accidental recipients, and postal system, on what account would they be different for purposes of § 1708? None that we can see. The statute protects the interests of sender and intended recipient in the privacy and integrity of their communication; these interests are identical whether the problem be misdelivery or misaddress. The willingness (indeed duty) of the postal system to make further attempts to deliver to the addressee or to return an item sent with first-class postage show that the "mail" is not at an end in either case. A change-of-address form makes the system's job easier, and postal officials are at liberty to return mail to the sender when the addressee has not filled out the proper form, but the addressee's failure to fill out the form does not permit the postal system to leave first-class mail with the occupant or entitle the occupant (who is unlikely to know whether the addressee filed the form) to open the mail. In a case such as *Logwood* the postal system's job ended before the theft: the letter had arrived at the correct address and been delivered to the addressee's agent. There was nothing more for the postal system to do. In our case, by contrast, the process of delivery would have continued, had Palmer not short-stopped mail that was not hers. Palmer should have returned to the Postal Service the envelopes addressed to Powell; the application of § 1708 will give persons in Palmer's position a good reason to do this.

Nothing in the legislative history of § 1708 looks in a contrary direction. There is almost no legislative history worth reading. See *United States v. Lopez*, 457 F.2d 396, 399 & n. 2 (2d Cir.1972); *United States v. Davis*, 33 F. 865 (W.D.Mich.1888). What little there is suggests that § 1708 was designed to protect the integrity of the mails, and from this perspective there is no difference between misaddressed and misdelivered mail that falls into the hands of raptors.

■ Palmer and Morrison ask us to apply the rule of lenity, maintaining that § 1708 is ambiguous. "Mail" is not a self-defining term, and § 1708 has more than a few ambiguities, but these do not assist the defendants. The rule of lenity, like other canons of construction, extends no further than the functions it serves. It does not preclude the implementation of the criminal law every time a statute needs construction, for all enactments require elucidation.

The "purposes underlying the rule of lenity [are] to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts". *United States v. Kozminski*, — U.S. —, 108 S.Ct. 2751, 2764, 101 L.Ed.2d 788 (1988). The rule of lenity reduces the likelihood that innocuous conduct will be penalized and reduces the incentive that vague criminal laws give to be ultracautious or to abstain from lawful activities that might be confused with the subjects of the statute. None of these interests is implicated by the construction we have placed on § 1708. Palmer and Morrison were on notice that their conduct was unlawful—under state law or § 1702 if not § 1708. See *Davis*, 461 F.2d at 89–90; *Ashford*, 530 F.2d at 795–96. The penalty provisions of § 1702 and § 1708 are identical; in most states the penalty for felony theft is greater than the penalty provided by these federal laws. An application of the rule of lenity would simply transfer this prosecution to § 1702—leading straight to the same outcome—or to state law. There is accordingly no reason to give "mail" in § 1708 a crabbed reading. Palmer and Morrison took three checks out of the postal system and must pay the penalty.

■ Both defendants contend that statements given and evidence collected during their interviews by postal inspectors should have been excluded at trial. The district court held that Palmer and Morrison accompanied the inspectors voluntarily, that reasonable persons in their position would have understood they were free to leave. These findings are not clearly erroneous, and the evidence was accordingly admissible.

AFFIRMED.