Karen A Springer, J Frank Kimbrough & Associates, Fort Wayne, IN, for Christie Kay Jo O'Hara, defendant.

**UNITED STATES of America,**

v.

**Christi Kay Jo O'HARA.**

**No. 1:01–CR–5.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

May 3, 2001.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on a Motion to Dismiss filed by the defendant Christi Kay Jo O'Hara on March 30, 2001. A brief in support of that motion was filed on April 6, 2001. The government responded to that motion on April 13, 2001 to which defendant filed a reply on April 20, 2001. For the following reasons, the motion to dismiss will be granted.

## Discussion

On January 24, 2001, an Indictment was returned against the defendant which reads as follows:

On or about September 1, 2000, in Allen County, Fort Wayne, Indiana, in the Northern District of Indiana,

CHRISTI KAY JO O'HARA

defendant herein, did steal and take out of mail delivered to Karl Art Cardinal, 1823 Griswold Drive, Apartment B–23, Fort Wayne, Indiana 46805, a first-class parcel containing a box of personal checks numbered 351 to 500 in the name of Karl Art Cardinal, drawn on the Hoosac Bank, North Adams, MA, sent from 149 Pleasant Street, North Adams MA 01247

All in violation of 18 U.S.C. § 1708.

(Rec.1). The events leading up to the Indictment, as essentially agreed to by the parties, are as follows.

On August 30, 2000, Charles H. Cardinal (Cardinal) took a box of checks to the United States Post Office in North Adams, Massachusetts. He obtained a larger box in which he put the checks, addressed the box to his son, Art Cardinal (Art) at 1823 Griswold Drive, Apartment B–23, Fort Wayne, Indiana, and mailed the same via first-class mail.

The checks in question were numbered 326 to 500 and drawn on account number 023–606781 at the Hoosac Bank in North Adams, Massachusetts. Art alleged that he never received the checks. Nevertheless, approximately sixty-seven of those checks were written to various Fort Wayne merchants during the month of September 2000, totaling close to $4,700.00.[1]

On September 22, 2000, Art had returned to him for insufficient funds a check he had written in the amount of $3,000. Upon making inquiry, he was informed that numerous checks had been written and he placed a stop on his account. Art received a copy of those checks that had been written, asserted that he did not write or authorize the writing of those checks, and signed a Hoosac Bank Affidavit to that effect.[2] He also signed an affidavit for the Postal Inspector which indicated that none of the signatures on the checks were his; that he did not authorize anyone to sign his name to the checks; that he did not cash any of the checks or receive any benefit from the proceeds of the checks; and that he did not remove the checks from the mailstream.

The apartment building where the checks were sent contained locked, wall-mounted mailboxes for each apartment. The mailboxes are located to the right of the entry door, on the first floor of the building. Art's apartment is located on the upstairs level of the apartment and the checks were left by the mailman outside Art's door.

Defendant admitted to Postal Inspectors that while babysitting in Apartment B–21 in early September 2000, she looked out the door and saw a box sitting in front of the door to apartment B–23. She picked up the box and returned to Apartment B–21. There she opened the box and found the checks.

So far as relevant, 18 U.S.C. § 1708 provides:

Whoever steals, takes, or abstracts, or by fraud or deception obtains, or attempts so to obtain, from or out of any mail, post office, or station thereof, let-

---

1. The checks were honored by the Hoosac Bank and Art's account was debited the amount of the checks.

2. Hoosac Bank sent Art a check for the total amount of the checks which had been forged.

ter box, mail receptacle, or any mail route or other authorized depository for mail matter, or from a letter or mail carrier, any letter, postal card, package, bag, or mail, or abstracts or removes from any such letter, package, bag, or mail, any article or thing contained therein, or secretes, embezzles, or destroys any such letter, postal card, package, bag, or mail, or any article or thing contained therein;

\* \* \* \* \* \*

Shall be fined under this title or imprisoned not more than five years, or both. 18 U.S.C. § 1708. The issue presented in this case is whether, when a postal employee leaves an oversize package outside the addressee's apartment door, its unauthorized removal constitutes theft of mail under that statute.

Several courts have been presented with factual patterns somewhat akin to those presented here. Closest to home is the Seventh Circuit's decision in *United States v. Logwood*, 360 F.2d 905 (7th Cir.1966). In that case—the only Seventh Circuit decision relied upon by the parties—the Seventh Circuit reversed a conviction for violation of section 1708 where a landlady's son was charged with theft of mail. The evidence showed that the landlady of an apartment building which had no mailboxes was given all of the mail for the building which she held for the tenants until they came to retrieve it. Her son's purloining of a piece of the mail from the windowsill was not a theft from the mail since " § 1708 in defining the offenses it interdicts enumerates the postal custody, mail receptacles, and 'other depository for mail

matter' it is designed to protect against theft" and since "[t]he section evinces no congressional intent to afford federal protection to items beyond those points." *Id.* at pp. 907–08. That language, facially at least, supports defendant's argument that the theft in this case does not fall within the prohibition of section 1708.

Much closer factually, and indeed really on all fours with this case, is the decision in *United States v. Thomas*, 361 F.Supp. 978 (N.D.Tex.1973). There, defendant was convicted on one count of possessing a check which had been stolen from an authorized depository of mail. A motion for a judgment of acquittal was filed which the court granted. It did so because there was no proof that the stolen check had, as alleged, been one stolen from an authorized depository of mail. Rather, the evidence showed that a Reverend Cooper had ordered some blank checks but, because the box they came in was too big to be placed in the mail slot of his door, the box was placed on the front porch and stolen from there. In reaching its conclusion that there was no theft from the mail, the court took the position that the porch floor was not an authorized depository and in fact the relevant postal regulations "prohibited that parcels be left on porches, steps or elsewhere unprotected except on the written order of the customer." *Id.* at 980.

 Clearly, *Thomas* pretty much squares with the facts here.[3] As for applicable regulations, the defendant points out that they still remain basically the same and in fact the Domestic Mail Manual dat-

---

**3.** This Court does not agree with the government's argument that since present defendant is charged with theft from the "mail" whereas the defendant in *Thomas* was charged with having taken checks from an "authorized depository for mail matter," the rationale of that case would not apply. Such would be a crabbed reading of a statute which on its face does not appear to contemplate such an interpretation. The statute places the phrase "or other authorized depository" following "mail, post office, or station thereof, letter box, mail receptacle, or any mail route," suggesting that those constitute authorized depositories for mail.

ed January 10, 2000, provided that "[a]n uninsured parcel is not left in an unprotected place, such as a porch or stairway, unless the addressee has filed a written order or the mailer has endorsed the parcel 'Carrier—Leave If No Response.'" Here, there is no suggestion either that Art filed a written order to have packages left on his doorstep nor is their any suggestion the package his father sent had instructions on it to leave it if there was no response.

Were *Thomas* controlling, the case would be at an end. However, it is not and the decision has been cast in doubt by the Third Circuit. In *United States v. Lavin*, 567 F.2d 579, 581, 582 (3d Cir.1977) that court found *Thomas* to "be good authority to support [defendant's] position" but also found *United States v. Lopez*, 457 F.2d 396 (2d Cir.) *cert. denied*, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 114 (1972) to be good authority for the opposite conclusion and, deciding that "it would be intellectually ingenuous to attempt a factual reconciliation of those holdings" which were "clearly in direct conflict," chose to follow *Lopez*.[4]

In *Lopez*, the defendant was charged with two counts of theft and possession of stolen mail. Of particular relevance was the charge relating to mail that was "delivered" to "Travel Agenda." The record showed that the letter carrier brought a bundle of mail to that business address on the given date but, finding the door to the suite locked, left the mail on the floor of the hallway outside. In rejecting the defendant's contention that the government had failed to establish a section 1708 violation, the Second Circuit wrote:

> ... While construing 'mail route' or 'mail' in the broadest sense might render some of the remaining portions of the statute superfluous in whole or in part, we see no need to go that far here. All we hold is that 'mail route' and 'mail' have an independent significance apart from mail box or receptacle; the former term at least includes a place such as an addressee's doorstep where mail is left by the letter carrier, and the latter term includes the letter so stolen.

*Id.* at 399. Importantly, in defining the term "mail route," the court noted that the legislative history of the term "does indicate that its genesis was descriptive of the location of mail boxes" but that in any event "the term is in the statute and has a common meaning, the core of which is the path or places where mail is collected and delivered." *Id.*

Even if, as *Lavin* suggests, *Thomas* and *Lopez* are in "direct conflict," this Court is not convinced that under *Lopez* (which has the broadest definition of the ambit of section 1708 of any cases either found by, or cited to, this Court) a violation has been established under the facts of this case. Recall that in *Lopez*, the mail was left at the in front of the door of the business when the suite was found to be locked whereas in this case the mail was found outside Art's apartment door. The former situation would appear to be within the "mail route" as defined by *Lopez;* to wit, where mail is collected and delivered. It is doubtful, however, that "mail route", even under the rationale of *Lopez*, could be stretched to include an apartment doorstep which is located on a different level than the existing locked mailbox.

This conclusion comports with the Seventh Circuit's decision in *United States v. Palmer*, 864 F.2d 524, 525 (7th Cir.1988) where the defendants were charged not with stealing out of a letter box or mail receptacle but rather with stealing out of the mail (with " 'mail' mean[ing] the postal

---

4. Later, in *United States v. Nolan*, 784 F.2d 496, 497 (3d Cir.1986), that court held that the *Lavin's* court rejection of *Thomas* "informs our holding in this case."

system and not a piece of mail"). In response to the question "[h]ow far does the postal system extend?", the Seventh Circuit wrote:

> ... One might say that it begins when the envelope is dropped into a depository and ends when the letter carrier puts it in a mailbox. There is substantial support for the conclusion that when the postal carrier delivers an envelope to the current residence of the addressee, the 'mail' is at an end. A good example is *United States v. Logwood.*

*Id.* at 525. Under this definition, the mail in this case ended when the checks were placed on Art's doorstep and, as such, defendant could not be said to have stolen from the mail.

This segues into the possibility of misdelivered mail—another basis on which the government contends that the facts presented in this case fall within the proscriptions of section 1708. It is true that the Seventh Circuit has held that misdelivered mail falls within the protection of section 1708,[5] as *Palmer* makes clear. However, this is not a case of misdelivered mail—the mail was delivered to the address on the box, 1823 Griswold, Apt. B–23—indeed the Indictment alleges that the defendant "did steal and take out of mail *delivered* to Karl Art Cardinal ... a box of personal checks."

The distinction being made by this Court is wholly supported by the Seventh Circuit's rationale in *Palmer* which "observe[d] that misdelivery by the postal system is an error that the system is obliged to correct; until it has done so, the item remains in the mail for purposes of § 1708." *Id.* at 526. Here, there was no error that the system was going to correct for if Art had returned home prior to the box being purloined, he would not have

placed it back in the system for the post office to correctly deliver. Thus, unlike *Palmer*, the process of delivery would not have continued had defendant "not short-stopped mail that was not hers." *Id.* at 527.

Apparently in an effort to salvage its prosecution, the government in footnote one of its brief points out that the statute also punishes possession and that defendant's conduct would be sufficient to be prosecuted as such. Even if that be so, that is not what defendant has been charged with—she is charged with theft. Moreover, the statute punishes possession of specified items "so stolen" or "so taken" ... "as herein described" and "herein described" means, under the terms of the statute, "from or out of any mail ... or other authorized depository for mail matter." As indicated the checks here were not "from or out of any mail." *See, United States v. Norwood,* 798 F.2d 1094, 1096 (7th Cir.1986) ("[t]he offense requires possession of property stolen from the mails").

■■■ In arriving at the foregoing conclusion, this Court is wholly aware that "[t]he mail theft statutes must be read in light of the 'realities of delivering and receiving mail in a modern urban environment.'" *United States v. Indelicato,* 611 F.2d 376, 381 n. 4 (1st Cir.1979) (citation omitted). The Court is also aware, however, that the so-called "rule of lenity" applies "when [a] choice has to be made between two readings of what conduct Congress has made a crime." *United States v. Balint,* 201 F.3d 928, 935 (7th Cir.2000). In considering this juxtaposition, this Court is of the view that Congress did not intend to make defendant's actions in this case a federal crime. That she may fully be prosecuted for theft

---

**5.** Indeed, contrary to some circuits, the Seventh Circuit also holds that section 1708 also

forbids the conversion of misaddressed mail.

and/or forgery or something else in state court is another matter altogether.

### *Conclusion*

On the basis of the foregoing, the Motion to Dismiss filed by the defendant Christi Kay Jo O'Hara on March 30, 2001 is GRANTED. The Indictment filed in this Court on January 24, 2001 is DISMISSED.