In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 19-2176 & 19-2177

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARVIN JONES and
ANGELA WANSLEY,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cr-00588 — **Robert W. Gettleman**, *Judge.*

———————————

ARGUED OCTOBER 2, 2020 — DECIDED MARCH 31, 2021

———————————

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Defendants Marvin Jones and Angela Wansley both worked for the United States Postal Service. Over a few months in 2016, they participated in a conspiracy to ship marijuana from California to Illinois through the United States Mail. Mr. Jones provided coconspirators with addresses in his postal area. The coconspirators then mailed the illicit packages to those addresses. Mr. Jones and

Ms. Wansley, using their roles in the Postal Service, intercepted the packages and handed them off to other members of the conspiracy. For their part in the operation, both Mr. Jones and Ms. Wansley took cash bribes.

The scheme ended when federal officers arrested Mr. Jones, Ms. Wansley, and several of their coconspirators. The Government tried Mr. Jones and Ms. Wansley together, and a jury convicted them of conspiracy, bribery, and obstruction of correspondence. They now contend that the Government presented evidence insufficient to sustain their convictions. After a full review of the trial record, we cannot accept this submission and therefore affirm their convictions on all counts.

# I

## BACKGROUND

Mr. Jones and Ms. Wansley worked at the United States Post Office in Tinley Park, Illinois, and its branch in Country Club Hills, Illinois. Mr. Jones was the acting customer service supervisor and Ms. Wansley was a sales and service associate.

From April 2016 to September 2016, Mr. Jones and Ms. Wansley, in concert with Jayson Smith and other coconspirators, arranged and executed a scheme to ship packages containing marijuana and marijuana derivatives through the mail. The scheme typically worked like this: Smith informed Mr. Jones that Smith's supplier, who was in California, was ready to ship a package containing marijuana. Mr. Jones provided Smith with an address to which the package could be sent, usually the address of someone with a hold on their mail or an empty P.O. box. Smith then had his supplier ship

the package to the address and gave the tracking information to Mr. Jones. When the package arrived at the post office in Illinois, Mr. Jones intercepted the package and gave it to Smith or one of Smith's confederates. In some instances, Mr. Jones had Ms. Wansley intercept the package. Smith paid Mr. Jones to provide him with the intercepted packages. Mr. Jones paid Ms. Wansley when she participated.

Federal law enforcement caught on to the scheme, and postal inspectors arrested Mr. Jones and Ms. Wansley. A federal grand jury returned a second superseding indictment, the applicable indictment for our purposes. It charged Mr. Jones with bribery (Count One), in violation of 18 U.S.C. § 201(b)(2)(C); conspiracy to commit obstruction of correspondence and theft of mail (Count Two), in violation of 18 U.S.C. § 371; obstruction of correspondence (Counts Three through Five), in violation of 18 U.S.C. § 1702; and theft of mail (Counts Six and Seven), in violation of 18 U.S.C. § 1708. Ms. Wansley also was charged in Counts One, Two, Three, Five, and Six. Before trial, the Government dismissed the mail theft charges.

At trial, the Government presented evidence that Mr. Jones and Ms. Wansley had accepted payments to intercept nineteen packages. In the spring of 2016, federal agents began investigating Smith. They conducted trash pulls at Smith's home that uncovered three packages. Later, agents intercepted a fourth package that contained marijuana. These discoveries led postal inspectors to begin surveilling the Tinley Park post office. On June 25, 2016, the federal agents watched Mr. Jones improperly scan three packages as delivered.

Three days later, Smith texted Mr. Jones, asking for addresses to which he could send the illicit packages. Mr. Jones sent Smith a list of four addresses, all belonging to residents with vacation holds on their mail. Smith shipped two packages to those addresses. On July 1, postal inspectors observed Mr. Jones remove one of the packages from the undelivered mail and improperly scan it; Ms. Wansley removed the other package. Later, agents observed Mr. Jones hand off the packages to Smith's associate, Courtney Poindexter.

On July 14, federal agents again observed Mr. Jones collect several packages from the post office and give them to another of Smith's associates. Ahead of the handoff, Mr. Jones texted Smith that another delivery would require Ms. Wansley's assistance. Mr. Jones also texted that he wanted to handle personally as many packages as possible to avoid paying Ms. Wansley. Smith responded: "Go head [sic] pay her," and Jones replied, "Ok."[1] As with the previous deliveries, Mr. Jones texted Smith a list of addresses to use for the shipments, again using Postal Service customers who had vacation holds on their mail.

A few days after that exchange, on July 18, Mr. Jones again supplied Smith with addresses, and Smith arranged for three more packages to be shipped from California. Smith texted Mr. Jones when he believed one of the packages had reached Chicago. Mr. Jones responded, "I'm on it," to confirm he would collect them and told Smith where to meet

---

[1] Tr. at 97.

for the exchange.[2] Jones also texted Smith that he had "paid Angela," referring to Ms. Wansley.[3]

Around the same time, unbeknownst to the conspirators, postal inspectors had intercepted several packages that they believed were linked to Smith and determined that each package contained marijuana or marijuana-laced products. The postal inspectors then manipulated the tracking system to make it appear that the packages had been mistakenly shipped to Missouri. When Mr. Jones texted Ms. Wansley about the missing packages, she responded: "Wow! Oh, well, gotta chalk that one up to the game."[4] Mr. Jones also told Ms. Wansley that the "rocket scientists" who mailed the packages called the Postal Service's customer service line to inquire about the delivery status.[5] Ms. Wansley responded, "Are you kidding me?"[6]

The postal inspectors placed one of the intercepted packages back into the mail. That package arrived at the Country Club Hills post office on July 30, and Ms. Wansley scanned it as "delivered, individual picked up at post office."[7] That same day, Ms. Wansley called Mr. Jones about the package.

---

[2] *Id.* at 136.

[3] *Id.* at 137.

[4] *Id.* at 165.

[5] *Id.* at 166.

[6] *Id.*

[7] *Id.* at 155.

Afterward, Mr. Jones texted Smith: "She got one so far."[8]
The postal inspectors then watched as Mr. Jones—who was
not scheduled to work that day—pulled into the Country
Club Hills post office parking lot, walked into the post office,
walked out five minutes later carrying the package that
Ms. Wansley had just improperly scanned as delivered, and
then drove off.

The postal inspectors repackaged another of the inter-
cepted packages using fake narcotics, then sent it to the Tin-
ley Park post office. On September 15, when the package ar-
rived, the local postmaster instructed Mr. Jones to return the
package to the sender. When he was arrested a short time
later, postal inspectors found that package secreted under
Mr. Jones's desk.

Perhaps the most damaging evidence at trial came from
Mr. Jones's and Ms. Wansley's statements to postal inspec-
tors following their arrests. During Mr. Jones's interview, he
admitted to providing Smith with addresses that he knew
had vacation holds or were unused P.O. boxes. Mr. Jones al-
so admitted that he had misdirected at least ten packages to
Smith and that he had suspected Smith was shipping mari-
juana in the packages. Mr. Jones also acknowledged that he
had accepted money from Smith in exchange for providing
the shipping addresses and collecting the packages once
they arrived in Tinley Park. When speaking to the interview-
ing agents, Mr. Jones further described his deal with Smith
as follows: "He want the packages, right? They ain't ad-
dressed to his house. I give him the packages. Oh, man,

_____

[8] *Id.* at 146.

thanks, man. Give me $100."[9] The exact amount Smith paid to Mr. Jones is unclear from the record, but in his interview with the officers, Mr. Jones estimated that it was "[n]o more than [$]1,400" over a four-month period.[10]

The postal inspectors interviewed Ms. Wansley the same day as Mr. Jones. In her interview, Ms. Wansley admitted to misdirecting, at Mr. Jones's request, roughly ten packages to someone other than the addressee. Ms. Wansley also confirmed that Mr. Jones had given her cash for handling the packages, totaling between $600 and $800 over approximately six months. She told the agents that she would receive the cash payments after she intercepted the packages. Ms. Wansley also told the interviewing agents that she thought the people to whom she provided the packages looked like "drug dealers" and that she knew her actions were wrong.[11]

During the trial, the Government called Natasha Wesley to testify. Wesley managed the Tinley Park and Country Club Hills branches. She stressed that Postal Service employees are taught to "ensure the mail is put into the proper hands, which means delivered to the address and the addressee that it is addressed to."[12] She also testified that the Postal Service has standard procedures used to ensure that mail is delivered to that address. Wesley explained that un-

---

[9] R.207-7 at 40.

[10] *Id.* at 59.

[11] Tr. at 308.

[12] *Id.* at 253.

der Postal Service rules, carriers identify the intended recipient of a package "[b]ased on what's legibly printed on the mail piece."[13] Carriers may give mail to the addressee only, Wesley testified. If the addressee wishes to designate someone else to receive the package, Wesley stated, that instruction must be in writing.

Mr. Jones and Ms. Wansley each testified at the trial. Mr. Jones told the jury that Smith was simply a customer who was having trouble with package deliveries, so Mr. Jones offered to help intercept Smith's packages. Mr. Jones also testified that the payments from Smith were tips for good postal service, not anything illicit. He also told the jury that because Smith was the intended recipient, not the addressee, he had delivered the packages as directed. Finally, Mr. Jones acknowledged that he had directed Ms. Wansley to help in the package misdirection scheme.

Ms. Wansley testified that she was just following orders from Mr. Jones, her supervisor. She admitted, however, that Postal Service regulations required her to report improper conduct by her supervisor to someone higher up in the chain of command. Ms. Wansley also admitted that Mr. Jones gave her money but denied that it was for mishandling the packages for Smith.

In closing arguments, Mr. Jones argued that he did what any good Postal Service employee would do: he went out of his way to make sure a customer received packages that the customer was expecting. No one, Mr. Jones submitted, was deprived of mail or packages because Smith was the intend-

---

[13] *Id.* at 261.

ed recipient. For her part, Ms. Wansley contended primarily that she was just following Mr. Jones's orders and therefore lacked corrupt intent.

The jury convicted Mr. Jones on all counts. The jury acquitted Ms. Wansley on one of the obstruction of correspondence counts, but convicted her on all the other counts against her. Both Mr. Jones and Ms. Wansley then moved for a judgment of acquittal, which the district court denied. The district court sentenced Mr. Jones to eight months' imprisonment, concurrent on all counts, and Ms. Wansley to thirty days' imprisonment, concurrent on all counts. This appeal followed.

## II

## DISCUSSION

Mr. Jones and Ms. Wansley contend that the evidence admitted during their trial was insufficient to support their obstruction of correspondence, conspiracy, and bribery convictions.

To succeed on their sufficiency of the evidence challenge, Mr. Jones and Ms. Wansley must show that, "based on the evidence presented at trial, no rational juror could find guilt beyond a reasonable doubt." *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). We will reverse a judgment of conviction only when the record is devoid of evidence to support the jury's finding of guilt beyond a reasonable doubt on every element of the offense. *See United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015). Moreover, in reviewing the record, we "view the evidence in the light most favorable to the government." *Morris*, 576 F.3d at 666. Put more directly, Mr. Jones and Ms. Wansley face a "nearly insurmountable

hurdle." *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992).

We will first address Mr. Jones's and Ms. Wansley's challenges to the obstruction of correspondence convictions and then turn to their challenges to the conspiracy and bribery convictions.

**A.**

The jury convicted Mr. Jones on three counts of obstruction of correspondence and convicted Ms. Wansley on one count. The obstruction of correspondence statute, 18 U.S.C. § 1702, provides, in relevant part:

> Whoever takes any … package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, … shall be fined under this title or imprisoned not more than five years, or both.

Mr. Jones's and Ms. Wansley's challenges to their obstruction of correspondence convictions rely entirely on their interpretation of the statute. In Mr. Jones and Ms. Wansley's view, even if we wholly credit the Government's evidence, their conduct did not violate the obstruction of correspondence statute. In short, although framed as a sufficiency of the evidence challenge, their submission is really that the charge brought by the Government fails to state an offense.

As a threshold matter, we must address the Government's contention that Mr. Jones and Ms. Wansley waived their challenge to the statute's scope. As the Government notes, an argument that the conduct alleged in an indictment does not state an offense is properly raised before trial. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). Waiver arguments are, however, waivable. *See United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004). For whatever reason, the parties litigated the interpretation of § 1702 at the motion for judgment of acquittal stage, following the jury's verdict. At that stage, the Government never contended that the time to challenge § 1702's scope had already passed.[14] We therefore will address the merits of Mr. Jones and Ms. Wansley's interpretation of § 1702, which they present in three parts.

First, Mr. Jones and Ms. Wansley submit that § 1702's use of the phrase "the person to whom [the package] was directed," includes the person whom the sender subjectively intends to receive the package, even if that person is not the addressee. They contend that, because Smith was the person whom the sender intended to receive the package, even though he was not the addressee, providing the package to Smith did not violate § 1702. The Government, on the other hand, maintains that the person to whom a package is "directed" is the addressee. Because Smith was not the addressee for any of the packages, the Government submits that Mr. Jones's and Ms. Wansley's providing him with the packages violated § 1702.

_____

[14] *See* R.160 (Government addressing the merits in its response to Mr. Jones's and Ms. Wansley's Rule 29 motions).

When we interpret a criminal statute, we must work with the words Congress enacted into law. If Congress provided a definition for the relevant term or phrase, we look to that definition as a starting point. *See United States v. Shaw*, 957 F.3d 734, 738 (7th Cir. 2020). When Congress has not provided its own definition, we will endeavor to give terms in a criminal statute their ordinary meaning. *Nichols v. United States*, 136 S. Ct. 1113, 1119 (2016). In doing so, we take into account the context in which Congress employed a term or phrase. *See Marinello v. United States*, 138 S. Ct. 1101, 1106–07 (2018); *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009).

Broadly speaking, the term "directed" can have different meanings in different contexts. Here, moreover, Congress did not provide its own definition for the term. Yet when read within the context of the rest of the statutory language of § 1702, it is clear that the person to whom a package is "directed" is the addressee, not a different person who the sender secretly and subjectively intends to receive the package.

This reading is anchored both in the words Congress used in crafting § 1702 and those it chose not to use. Starting with the words Congress used, as we have just pointed out, the term that matters most in this case is "directed." In ordinary English, a package is "directed" to the addressee. *See* Webster's New International Dictionary 737 (2d ed. 1947) ("[T]o write an address upon; to mark with name and residence of one to whom a thing is sent; to superscribe; as, to direct a package."). Other courts have adopted implicitly this understanding when they have used interchangeably "the person to whom it was directed" and "the addressee"

when discussing § 1702. *See United States v. Childs*, 598 F.2d 169, 172 (D.C. Cir. 1979) (Section 1702 targets obstruction "at any time before the letter reaches the addressee."); *United States v. Wade*, 364 F.2d 931, 934 (6th Cir. 1966) ("Undoubtedly, the Congress in enacting 18 U.S.C. § 1702 … was properly intending to insure that correspondence between a sender and an addressee be unobstructed until manually delivered to the addressee."). Moreover, § 1702 prohibits obstruction of "any letter, postal card, or package" before it is "delivered." In the context of the postal system, a postal carrier delivers a package to the addressee. As for the words Congress chose not to use, we find it notable that § 1702 makes no explicit mention of the package sender's subjective intent. If Congress had intended Mr. Jones and Ms. Wansley's reading of § 1702, surely it would have said so far more explicitly.

This is not to say that, *in other contexts*, the sender's intent is irrelevant; our case law regarding misaddressed and misdelivered mail indicates that the sender's intent is relevant under the mail theft statute, 18 U.S.C. § 1708. Yet our case law interpreting § 1708 shows that, even in that context, Congress intended that the sender's intent be ascertained by looking at the address, not by inquiring into the sender's secret thoughts when placing a package in the mail. *See United States v. Palmer*, 864 F.2d 524, 527 (7th Cir. 1988) (In the context of the mail theft statute, an unintended recipient may learn the sender's intent "from the name of the addressee, the address on the envelope, or both.").

The related federal mail theft statute, 18 U.S.C. § 1708, is therefore compatible with, and bolsters, our reading of § 1702. Our cases interpreting § 1708 make clear that Congress intended that the address on the mail determines a

package's status as mail and the destination of that mail. In *United States v. Logwood*, 360 F.2d 905, 908 (7th Cir. 1966), we held that a letter is no longer "mail" once it reaches its addressee (or the addressee's agent). On the other hand, we held in *United States v. Palmer*, 864 F.2d at 525–27, that a person who keeps a misdelivered or misaddressed letter has committed mail theft, even though the postal carrier delivered the letter to him or her. A person who receives misaddressed or misdelivered mail, we said, should return it to their postal carrier. *See id.* at 527.

In Mr. Jones and Ms. Wansley's view, our reading of § 1702 would sweep into its ambit every instance of misdelivery or misaddress. At oral argument, counsel suggested that our reading risked criminalizing the postal carrier who recognizes an obviously misaddressed letter and delivers it to the person the carrier knows was meant to receive it. We do not share counsel's concern. A postal carrier who sees a letter addressed, for example, to Mark Twain at 531 Farmington Avenue might recognize the name and realize the sender meant *351* Farmington Avenue. Surely, however, the postal carrier does not act "with design to obstruct the correspondence" when delivering the letter to Mr. Twain. Along the same lines, if the postal carrier delivers a letter addressed to Mr. Twain at the correct address, but Mr. Twain no longer lives there, the new occupant is obligated to return the letter to the postal carrier; we said as much in *Palmer*, 864 F.2d at 525–27. It is the Postal Service's responsibility, then, to identify Mr. Twain's new address or return the letter to the original sender. Counsel's overbreadth concerns therefore are not realistic.

The second part of Mr. Jones and Ms. Wansley's argu-ment relies on *United States v. Grieco*, 187 F. Supp. 597 (S.D.N.Y. 1960). In that case, detectives suspected that a hotel bellhop was stealing guests' mail, sent decoy mail to a fake guest, and then arrested the bellhop when they found him in possession of the decoy mail. *Id.* at 597–98. The district court dismissed the charges, concluding that § 1702's use of the phrase "the person to whom [the letter] was directed," means "that unless there is in fact such a person, there can-not be a violation of that section." *Id.* at 599.

Mr. Jones and Ms. Wansley contend that their case in-volves the equivalent of fictitious addressees because the people listed on the packages never expected to receive any-thing. We do not think this comparison is an apt one. After all, this case does not involve packages sent only to fictitious addressees.[15] Rather, a key part of the scheme was to use *real* addresses for the shipments. We can leave for another day whether *Grieco* reached the correct legal interpretation of § 1702. For today, materially different facts are enough to foreclose Mr. Jones and Ms. Wansley's reliance on that case. *Accord United States v. Brown*, 551 F.2d 236, 241 (8th Cir.

_____

[15] During oral argument, counsel for Ms. Wansley suggested that two of the packages involved a fictitious addressee. The packages counsel refer-enced were addressed to "Mr. Santos" and "Mr. and Mrs. Santos," re-spectively. Tr. at 230–31. Although there was no evidence that a "Mr. Santos" lived at that address, a woman named "Ms. Santos" testi-fied that she lived there. We think that is sufficient to distinguish these packages from the wholly fictional addressee in *Grieco*. Moreover, Ms. Wansley was not charged in the count related to these packages. R.83 at 7. Mr. Jones makes no mention of the packages sent to Mr. Santos in the argument section of his brief. Jones's Br. 9–13.

1977) (distinguishing *Grieco* from a case involving mail addressed to a real person); *United States v. Butler*, 822 F. App'x 390, 396 (6th Cir. 2020) (same).

Mr. Jones and Ms. Wansley also ask that we apply the rule of lenity and adopt their reading of "to whom it was directed." However, the rule of lenity applies "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *United States v. Shabani*, 513 U.S. 10, 17 (1994). When the statute's "text and context leave no doubt" as to the proper interpretation, we have no occasion to apply the rule. *Shular v. United States*, 140 S. Ct. 779, 787 (2020). Applying ordinary tools of statutory interpretation, § 1702's text and context lead us to conclude *confidently* that a letter or package is "directed" only to its addressee; there is therefore no basis for us to apply the rule of lenity.

With the statutory interpretation question solved, we turn to a review of the evidence. It is very clear that the evidence is sufficient to uphold the jury's verdict. Mr. Jones and Ms. Wansley acknowledge that they handed off the packages to Smith and his associates, even though none of those individuals were the addressees listed on any of the packages. A jury could reasonably find that Mr. Jones and Ms. Wansley intentionally obstructed the packages before they reached the person to whom they were directed. The jury's verdict on the obstruction of correspondence counts must stand.

**B.**

We turn next to Mr. Jones's and Ms. Wansley's convictions for conspiracy. The jury found Mr. Jones and

Ms. Wansley guilty of violating the general conspiracy stat-
ute, 18 U.S.C. § 371, which provides, in relevant part:

> If two or more persons conspire either to
> commit any offense against the United States,
> … or any agency thereof in any manner or for
> any purpose, and one or more of such persons
> do any act to effect the object of the conspiracy,
> each shall be fined under this title or impris-
> oned not more than five years, or both.

The elements the Government must prove to sustain a con-
spiracy conviction are well established: "(1) an agreement to
commit an offense against the United States; (2) an overt act
in furtherance of the conspiracy; and (3) knowledge of the
conspiratorial purpose." *United States v. Soy*, 454 F.3d 766,
768 (7th Cir. 2006).

Mr. Jones's attack on his conspiracy conviction depends
entirely upon our decision regarding his obstruction of cor-
respondence convictions. He states that, "[i]f there was no
violation of [section] 1702 in this case[,] then there can be no
conspiracy."[16] As we have already explained, however, there
was sufficient evidence to convict Mr. Jones on the § 1702
counts. Mr. Jones's conspiracy conviction therefore stands as
well.

Ms. Wansley offers three reasons for us to vacate her
conspiracy conviction.[17] First, she contends that there was

---

[16] Jones's Br. 13.

[17] Mr. Jones's and Ms. Wansley's conspiracy convictions both stem from
Count Two of the operative indictment. In this appeal, Mr. Jones and
Ms. Wansley filed separate briefs. Although Mr. Jones adopted several

(continued … )

little evidence that she joined the agreement to commit the underlying substantive offense (obstruction of correspondence). In her view, a rational jury could not have concluded that she had joined the agreement to obstruct the mailed packages. During the trial, Special Agent Lawler, one of the agents who interviewed Ms. Wansley, testified that Ms. Wansley admitted that "on approximately [ten] occasions, she intentionally mishandled parcels" by pulling them off the line at the request of "someone other than the addressee."[18] Ms. Wansley also admitted to Special Agent Lawler that she intentionally had scanned the parcels as "delivered" even though she instead had set them aside for Mr. Jones.[19] Moreover, Ms. Wansley told Special Agent Lawler that people whom she described as "drug dealers" came to collect the mishandled packages.[20] Finally, Ms. Wansley admitted that she received a few hundred dollars in cash from Mr. Jones over the course of six months for mishandling the packages. Notably, Special Agent Lawler testified that Ms. Wansley would "receive these payments after she mishandled the parcel and when she was walking out of work for the end of the day."[21] Special Agent Bellamy, who was also present for Ms. Wansley's interview, testified

---

( … continued)

sections of Ms. Wansley's brief, he did not adopt her section on the conspiracy conviction.

[18] Tr. at 306–07.

[19] *Id.* at 307.

[20] *Id.* at 308.

[21] *Id.* at 309; *see also id.* at 575 (testimony of Special Agent Bellamy).

along the same lines as Special Agent Lawler. Both agents also testified that Ms. Wansley conceded that she knew what she was doing was wrong.[22] A rational jury could consider this evidence to be proof that Ms. Wansley joined the conspiracy.

Second, Ms. Wansley contends that the evidence does not support a finding that she *knowingly* became part of the conspiracy. Of course, members of a conspiracy must know that others are in the conspiracy. *United States v. Carrillo*, 435 F.3d 767, 777 (7th Cir. 2006). They do not need to know, however, all the other coconspirators, nor do they have to participate in all aspects of the conspiracy. *See id.* In addition to the evidence we already have recounted, the Government presented at trial text messages between Mr. Jones and Ms. Wansley. In those messages, Mr. Jones and Ms. Wansley discuss the package mishandling scheme and reference (although not by name) the other members of the conspiracy. From this evidence, the jury could conclude rationally that Ms. Wansley knowingly and deliberately joined the conspiracy.

Next, Ms. Wansley suggests there was an impermissible discrepancy between what the indictment alleged and what the Government proved at trial. In her brief, Ms. Wansley maintained that, because the conspiracy count included conspiracy to steal mail in violation of 18 U.S.C. § 1708, the Government's failure to convict her of mail theft warrants reversal. At oral argument, however, Ms. Wansley modified

---

[22] *Id.* at 314 ("Ms. Wansley stated that when she received cash for the first time, it confirmed in her mind that what she was doing was not right."); *id.* at 580–81.

somewhat this assertion. She acknowledged that the Government charged a "dual object" conspiracy—that is, a conspiracy to commit two different offenses. She nevertheless contended that the evidence was insufficient with respect to both objects.

In the indictment, the conspiracy count included two objects: the first was mail theft, in violation of 18 U.S.C. § 1708; the second was obstruction of correspondence, in violation of 18 U.S.C. § 1702. The Government elected to proceed at trial on the obstruction of correspondence object of the conspiracy and not on the mail theft object. We have held that such an approach is permissible. *See United States v. Beverly*, 913 F.2d 337, 357 (7th Cir. 1990) (explaining that a guilty verdict on a dual-object conspiracy will be upheld so long as there is sufficient evidence establishing one of the objects); *see also United States v. Martin*, 618 F.3d 705, 737 (7th Cir. 2010). Thus, it makes no difference whether the Government presented sufficient evidence of Ms. Wansley's conspiracy to commit mail theft (one object), so long as it presented sufficient evidence that she conspired to obstruct correspondence (the other object).

We conclude, therefore, that the Government's evidence against Ms. Wansley regarding conspiracy to obstruct correspondence was sufficient to support her conviction.

## C.

We now examine Mr. Jones's and Ms. Wansley's challenges to their bribery convictions under Count One of the indictment. The provision under which Mr. Jones and Ms. Wansley stand convicted reads as follows:

Whoever … being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for … being induced to do or omit to do any act in violation of the official duty of such official or person … shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

18 U.S.C. § 201(b)(2)(C). The bribery statute's use of "corruptly," the intent requirement, cabins its scope to defendants who receive money for the unlawful purpose of violating their official duties. *See United States v. Peleti*, 576 F.3d 377, 382 (7th Cir. 2009). It also requires evidence of a quid pro quo, the exchange of a thing of value for the violation of an official duty. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999). The existence of a quid pro quo is what chiefly distinguishes a bribe from a gratuity. Unlike a bribe, a gratuity "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405.

Mr. Jones and Ms. Wansley contend that the evidence presented at trial might have been sufficient to prove an illegal gratuity, but it was insufficient to establish bribery. Both

Mr. Jones and Ms. Wansley submit that there was no evidence of a quid pro quo.

We take a very different view of the evidence. A rational jury surely could have found that the Government proved a quid pro quo for both defendants. Mr. Jones's statements during his post-arrest interview with a postal inspector in September 2016 come close to outright admitting a quid pro quo. Here is the relevant question and answer:

> [Postal Inspector:] [Y]ou gotta help us understand. How does this work? So [Smith] said he was gonna compensate you. You come to … an agreement on what you're gonna get for what, … you given the circumstances.
>
> Jones: Well, … here was the scenario. … He want the packages, right? They ain't addressed to his house. I give him the packages. Oh, man, thanks, man. Give me $100.[23]

The Government also showed the jury text messages between Smith and Mr. Jones. In those messages, Mr. Jones implored Smith to provide full payment despite some missing packages. Later, Mr. Jones asked Smith if he should retrieve one of the packages; Smith responded, "[y]ou can if you want the money money," to which Mr. Jones replied "Ok."[24] At trial, Mr. Jones testified that he was merely talking about tips for good service during that interview. But the jury was permitted to assess the context in which his state-

---

[23] R.207-7 at 40; *see also* Tr. at 441.

[24] Tr. at 190.

ments were made, to disbelieve his explanation, and to find that Mr. Jones had violated his official duties in exchange for payments from Smith.

The evidence of a quid pro quo against Ms. Wansley was less direct, but still sufficient. The messages between Smith and Mr. Jones contain multiple statements by Mr. Jones about paying Ms. Wansley to intercept packages on his behalf. Moreover, the evidence showed Ms. Wansley received payments *after* intercepting packages for Mr. Jones on multiple occasions over the span of months. The jury was entitled to find that Ms. Wansley received the payments in exchange for actions in breach of her duties as a postal employee. Indeed, the evidence overwhelmingly establishes this element of the offense.

Mr. Jones and Ms. Wansley also both contend that there is insufficient evidence that they acted "corruptly." Yet the evidence certainly permits such a finding. For example, Ms. Wansley admitted to a postal inspector that she knew that what she was doing was wrong. Ms. Wansley also admitted that she suspected that Smith and his associates were drug dealers, yet she continued to participate in this package interception scheme. For his part, Mr. Jones admitted during his trial testimony that his conduct violated postal regulations. He also sent a text message to Smith with a picture of a catwalk over the mailroom that postal inspectors use to surveil mail operations. The jury was entitled to accept the Government's argument that, through that picture, Mr. Jones attempted to describe the risk that he was taking by violating his official duties and participating in Smith's scheme. Thus, a rational jury could find that both Mr. Jones and Ms. Wansley acted corruptly.

**Conclusion**

We conclude that the Government presented sufficient evidence to support the jury's guilty verdicts against Mr. Jones and Ms. Wansley. They committed the offenses charged in the indictment. Accordingly, we affirm their convictions.

AFFIRMED